SAVE THE AUDUBON COALITION et al., Appellants, v CITY OF NEW YORK et al., Respondents.

First Department, June 9, 1992

349

## APPEARANCES OF COUNSEL

*Matthew J. Chachère* of counsel *(Kenneth D. Schaeffer,* attorney), for appellants.

*Elizabeth I. Freedman* of counsel *(Louise G. Roback, Francis F. Caputo* and *Albert Fredericks* with her on the brief; *Robert Abrams, Attorney-General,* and *O. Peter Sherwood, Corporation Council,* attorneys), for City of New York and others respondents.

*Martin E. Gold* of counsel *(Brown & Wood,* attorneys), for Trustees of Columbia University of the City of New York, respondent.

### OPINION OF THE COURT

Ross, J.

The Audubon Research Park is a biomedical research complex envisioned for a four-block area, in the Washington Heights section of Upper Manhattan, near Columbia-Presbyterian Medical Center. If the project is fully completed, the site, bounded by West 168th Street, Audubon Avenue, West 165th Street and Broadway, will be occupied by five research buildings with approximately 700,000 square feet of biomedical research space. The space is to be devoted primarily to five major areas of biomedical research: pharmaceutical research; genetic engineering; production of devices for orthopedics; production of diagnostic instruments; and related biomedical services such as database companies and testing laboratories. The project is jointly sponsored by the New York City Public Development Corporation, now named the New York City Economic Development Corp. (EDC), the New York State Urban Development Corporation (UDC) and The Trustees of Columbia University.

The first building to be constructed will be the Audubon Research Building. The structure, as planned, will be a six story building consisting of retail space on the ground floor, and commercial laboratories in the remainder of the building. It will be located on the block defined by West 166th Street, St. Nicholas Avenue, West 165th Street and Broadway. The block is owned by the City of New York and is currently the site of the Audubon Theater and Ballroom. Although the Audubon Theater and Ballroom is largely vacant and has fallen into a state of disrepair, it remains architecturally significant as an example of the early 20th century neoclassical revival style, and historically significant as the location of the assassination of Malcolm X in 1965.

The EDC, UDC and Columbia University first agreed to sponsor the project in 1987. The parties agreed that the EDC and UDC would provide substantial funding and that the University would provide a lesser amount of funding but would also act as the developer and manager of the facility. The plan calls for the City of New York as owner of the land on which the Audubon Research Building is to be built, to

lease the property to the EDC for 99 years and for the EDC to assign its leasehold interest to Columbia University.

In 1988, the cosponsoring parties submitted an application to the Department of City Planning (DCP) pursuant to the Uniform Land Use Review Procedure (New York City Charter § 197-c [ULURP]) for the amendments to the Zoning Map, special permits and authorizations necessary for the development of the Audubon Research Building. The DCP also had before it proposed amendments to the text of the Zoning Resolution of the City of New York which would permit the City Planning Commission (CPC) to issue special permits allowing commercial scientific research and development facilities in areas zoned for commercial use. Specifically the ULURP application sought:

(a) authorization for the disposition of the Audubon Research Building site to the EDC and thereafter to Columbia University;

(b) an amendment to the Zoning Map changing the designation of the four-block area in which the research park is to be constructed from C-4 and R8 (with a C1-4 commercial overlay) to C6; and

(c) a special permit pursuant to proposed zoning text amendments which would authorize the construction of the Audubon Research Building itself as a scientific research and development facility in a C6 zoning district.

Apparently, the proposed text amendments to the Zoning Resolution, the application for the Zoning Map changes, and authorization for the property disposition and special permits, were subjected to a contemporaneous but discrete environmental review process. In March of 1989, the applications for the Zoning Map changes, property disposition and special permits were submitted to the DCP and the New York City Department of Environmental Protection (DEP), as the co-lead agencies, for the environmental review required under the City Environmental Quality Review Act (CEQR) and the State Environmental Quality Review Act (SEQRA), which CEQR implements. In August of 1989, the Project Data Statement describing the proposed text amendments to the Zoning Resolution, which would allow the issuance of special permits for commercial research and development facilities in areas zoned C6, was submitted to the same co-lead agencies. It should be noted that the designation of the DCP and DEP as co-lead agencies for the purposes of the required environmental re-

view comports with the law, as the Board of Estimate retained the authority to make the final determination with respect to the applications and was entitled to rely on the expertise of the DEP and DCP *(see, Akpan v Koch,* 75 NY2d 561, 575 *affg* 152 AD2d 113; *see also, Matter of Neville v Koch,* 79 NY2d 416).

With respect to the applications for the Zoning Map changes, the co-lead agencies determined, upon receipt of the applications, that the changes, authorizations and permits applied for would have a significant impact on the environment and that an Environmental Impact Statement (EIS) would be required. However, in November 1989, the DCP and DEP issued a Negative Declaration which indicated that the proposed Zoning Resolution text amendments would not have a significant impact on the environment. Thereafter, several revisions to the proposed text amendments were submitted to the co-lead agencies in January and May 1990, and in June 1990 the co-lead agencies informed the CPC that the revisions would not produce a significant environmental impact and that the original Negative Declaration remained valid.

Public review of the zoning text amendments, as required by New York City Charter § 200, began in February 1990. In April and May 1990, Manhattan Community Boards 2, 5, 6, and 8 adopted resolutions disapproving of the text amendments. However Community Board 12, under whose jurisdiction the construction site falls, adopted a resolution recommending approval of the zoning text amendments. The CPC also conducted public hearings regarding the proposed amendments in May 1990, and in June 1990 adopted a report and resolution approving the amendment, in which it found that the amendments would not have a significant impact on the environment. In August of 1990, the Board of Estimate (BOE) conducted a public hearing concerning the proposed amendments, and at its conclusion, adopted a resolution granting final approval to the Zoning Resolution text amendments, on the basis of the environmental determination contained in the City Planning Commission's report and the Negative Declaration issued by the DEP and DCP.

The path toward approval of the applications for the Zoning Map changes, land disposition authorization and special permits, was not nearly as direct as that which led to the adoption of the Zoning Resolution text amendments. The Draft Environmental Impact Statement (DEIS) was submitted to the co-lead agencies by the cosponsors in February 1990.

Review of the DEIS shows that it identified the historical and architectural significance of the Audubon Theater and Ballroom, and analyzed the impact of the proposed project on land use and community resources, population and housing, the general historical and visual character of the area, open space and recreational facilities, economic conditions, traffic and transportation, air quality, noise, infrastructure, public health and safety, and soil and groundwater contamination. In addition, the DEIS proposed and analyzed alternatives to the project and measures which would mitigate the environmental impact of the project, and analyzed the impact of not building the facility at all.

On February 28, 1990, the co-lead agencies filed and released a Notice of Completion of the DEIS. On April 4, 1990 Manhattan Community Board 12 conducted a public hearing and, on April 24, 1990 voted 24 to 1, with 1 abstention, to adopt a resolution approving the applications, with limitations. The CPC scheduled a public hearing for May 2, 1990 on the applications and the DEIS. A Notice of Public Hearing had been issued by the co-lead agencies on the DEIS on April 10, 1990; it was published in the New York Daily News on April 16, 1990 and in the City Record from April 18 to May 1, 1990. The CPC public hearing was held as scheduled. As a result of the public hearing the cosponsors modified the plan to provide, *inter alia,* for the preservation of almost half of the Audubon Theater and Ballroom. The revised plan provides that the Ballroom and the facade would be renovated and rehabilitated. Moreover the preserved portion of the Audubon Ballroom would contain two separate facilities namely, a Malcolm X Memorial and a health care facility. The preservation project would be owned and operated by the City, with assistance from Columbia University in running the health care facility.

The Final Environmental Impact Statement (FEIS) was submitted by the cosponsors in June 1990. It recapitulated much of the DEIS but revised the analysis in certain areas and addressed the public comments made on the DEIS. On June 27, 1990 the CPC unanimously approved, with various restrictions, the Zoning Map changes, the special permit and the property disposition necessary for the development of the Audubon Research Building. Additional minor revisions concerning the preservation of a portion of the Audubon Ballroom were made by the sponsors, which did not affect the validity of the FEIS. On August 20 and 21, the Board of

Estimate held a public hearing on the application for the Zoning Map changes, property disposition authorization and the special permits. The Board of Estimate, as lead agency, approved all of the applications at the conclusion of the hearings, as modified in a Memorandum of Understanding between the cosponsors and the Manhattan Borough President.

So that funding could be obtained from the Port Authority, the Mayor requested the Port Authority to include the Audubon Research Building project in the Port Authority's Industrial Development plan. Eventually, this was done.

Petitioners, an unincorporated association of community residents of West Harlem and Washington Heights, and five individuals who reside in the community, commenced the CPLR article 78 proceeding which underlies this appeal, seeking to invalidate virtually all of the approvals issued by the City of New York, with reference to the various applications filed by the cosponsors, as violative of SEQRA, CEQR and the ULURP. In addition, the petitioners sought to enjoin the respondents from disposing of the property, dispersing public funds, demolishing the Audubon Ballroom, or proceeding with the project in any way until the statutory requirements of SEQRA, CEQR and ULURP were complied with.

Petitioners challenge the adoption of the amendments to the Zoning Resolution which would allow, only upon the issuance of a special permit, biological research in areas zoned C6. Petitioners claim, in substance that respondents failed to take the requisite "hard look" at the environmental impact of allowing such research in C6 commercial areas City-wide.

Petitioners also challenge the approval by the respondents of the Zoning Map changes, property disposition, and special permits specific to the Audubon Research Park. The petitioners' contention relating to the site-specific approvals is essentially that the Environmental Impact Statements, upon which the approvals allowing the project to proceed were based, were fundamentally flawed. Specifically, petitioners argue that while the FEIS identified public health and safety as a relevant area of environmental study, the statement contained no specific assessment, finding or conclusion regarding the potential or probable environmental impacts of the proposed activities. It is also claimed that the respondents failed to comply with the specific provisions of SEQRA and CEQR which delineate the procedure for the mandatory public notice and oppor-

tunity to comment on the Environmental Impact Statements; with reference to this claim, it was argued that the Notice of Completion of the DEIS was facially defective.

Given the fact that agreed-upon revisions to the project have significantly mitigated the impact on the Audubon Ballroom structure itself, petitioners have, on appeal, apparently abandoned the portion of their challenge based upon the effect the project will have on the historical significance of the site.

It is by now well settled that "[j]udicial review of a lead agency's SEQRA determination is limited to whether the determination was made in accordance with lawful procedure and whether, substantively, the determination 'was affected by an error of law or was arbitrary and capricious or an abuse of discretion' " *(Akpan v Koch,* 75 NY2d 561, 570, *supra).* "In assessing an agency's compliance with the substantive mandates of the statute, the courts must 'review the record to determine whether the agency identified the relevant areas of environmental concern, took a "hard look" at them, and made a "reasoned elaboration" of the basis for its determination' " *(supra,* at 570). Our assessment of an agency's compliance with the substantive requirements of the statute is governed by a "rule of reason" *(Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400, 417). The extent to which particular environmental factors are to be considered varies with the circumstances and the nature of the particular proposals *(Matter of Jackson v New York State Urban Dev. Corp., supra,* at 417) and, "not every conceivable environmental impact, mitigating measure or alternative, need be addressed in order to meet the agency's responsibility" *(Matter of Neville v Koch,* 79 NY2d, *supra,* at 425). "While judicial review must be meaningful, the courts may not substitute their judgment for that of the agency for it is not their role to 'weigh the desirability of any action or [to] choose among alternatives' " *(Akpan v Koch, supra,* at 570).

Our review of the petitioners' submissions shows that petitioners have focused their challenge to the site-specific approvals on public health and safety issues, with the main emphasis being placed on the expected use and possible release of hazardous chemicals, radioactive material and specifically biohazardous materials at the research facilities, which are to be located in a populated area. Review of the 600-page FEIS shows that it identifies and analyzes the public health and safety considerations which petitioners argue were virtually completely ignored.

The document is prefaced by a 34-page "Executive Summary" containing four sections corresponding to four major sections of the FEIS itself. Section A, entitled "Project Description", generally describes the nature of the project, the rezoning requested and the ultimate goals of the cosponsors. Section B, entitled "Probable Impacts of the Proposed Action", describes the conclusions reached in the body of the FEIS regarding the environmental impact of the project. This section contains subsections corresponding to each of the corresponding chapters of the FEIS. Section C, entitled "Alternatives", proposes and analyzes alternatives to the project as proposed. Section D, entitled "Mitigation", discusses methods of mitigating the perceived adverse environmental impact of the proposed action.

In its consideration of the public health and safety issues the FEIS states, *inter alia,* that the companies expected to occupy the commercial laboratory space at the facility would be likely to use some potentially hazardous chemicals, biohazardous microorganisms, and radioactive materials. According to the FEIS, the only hazardous chemicals which would be used at the facility would be solvents, such as chloroform, petroleum distillates, and carbon tetrachloride. All of the laboratories where hazardous chemicals would be used would be equipped with fume hoods to protect workers from potentially harmful fumes. The hoods would vent the fumes to the outside. An impact analysis was performed using chloroform for a "worst-case" spill analysis. The analysis indicated that in the event of a "worst-case" spill, the maximum concentration of chloroform surrounding the proposed structures would be below the Federal Office of Safety and Health Administration (OSHA) short-term occupational exposure standard. The FEIS noted additionally that no significant use of toxic or explosive gases was expected at the project.

Biohazards are defined as infectious bacteria, viruses, fungi, protozoa and some recombinant DNA molecules. They are classified according to the level of containment they require with Biosafety level 1 being the lowest level of containment and Biosafety level 4 being the highest level of containment. The FEIS notes that the research and laboratory-scale production activities envisioned for the project would be similar to such activities currently being performed in existing laboratories operating at Columbia-Presbyterian Medical Center. Use of such materials would be restricted to biohazardous agents requiring low levels of containment according to the

guidelines of the National Institutes of Health and Centers for Disease Control.

The FEIS specifies that the leases for the commercial research space would limit the use of biohazards to those requiring no more than Biosafety level 2 containment. Biosafety level 2 is appropriate for work involving agents of moderate hazard to personnel and the environment. Laboratory personnel working in a Biosafety level 2 environment have specific training in handling pathogenic (disease-causing) agents and work at the direction of trained scientists. Access to the laboratory is limited to those times when work is being conducted, and certain procedures in which infectious aerosols are created are conducted in safety cabinets or other physical containment. Biological safety cabinets and containments filter exhaust air through high-efficiency particulate air filters to remove any suspended microorganisms. Biosafety level 2 is used for work with most common pathogens, except for some serious pathogens that are easily transmitted, such as tuberculosis bacteria, and some human and animal pathogens that do not occur in this country. Work with genetically modified pathogens generally requires a containment level greater than Biosafety level 2.

Petitioners argue extensively that the FEIS failed to identify the controversial nature of research using biohazardous organisms and recombinant DNA (R-DNA) technology, failed to address the high incidence of laboratory accidents involving bioengineering and the foreseeability of such accidents occurring at the proposed facility, and failed to address the perceived inadequacy of the applicable regulations which the FEIS stated would be used as guidelines for the project. Petitioners' argument is, however, largely based on information from the 1970's and early 1980's. Petitioners' arguments are answered chiefly by affidavits from respondents' experts, Dr. Stephen S. Rosen, whose environmental consulting firm prepared the Environmental Impact Statements, and Dr. Edward L. Gershey, Associate Professor and Director of Laboratory Safety at Rockefeller University. The affidavits indicate that in the time period subsequent to the data relied upon by petitioners advances have been made in both the scientific community's knowledge of the substances and the laboratory procedures, which alleviate many of the concerns voiced in the early studies which are echoed by the petitioners.

Dr. Gershey specifically noted that the FEIS considered all aspects of the proposed laboratory operations addressed by the

various regulations and guidelines and concluded that the considerations given in the FEIS to the potential impact of the proposed laboratories on the workers, the public and the environment, were conservative and thorough. Dr. Gershey stated also that the type of biomedical research questioned by the petitioners is currently being carried out in numerous hospitals, academic institutions and other facilities throughout the New York City area, within areas of dense population, without notable safety impacts. The record also reflects that the National Institutes of Health conducts regular reviews and surveillance of new and existing projects to assure compliance with its guidelines.

It should be noted also that the Board of Estimate subjected the Impact Statements to public review and comment in addition to that conducted by the co-lead agencies. Furthermore, the New York City Department of Health submitted its review of the project done in connection with the land use applications necessary for the construction of the Audubon Research Building. Therein, it concluded that no immediate public health risks were presented.

Petitioners have failed to demonstrate that the Board of Estimate's determinations approving the site-specific Zoning Map changes, property disposition and special permits, were not rationally based, constituted an abuse of discretion or resulted from an error of law. To conclude otherwise, as the petitioners urge, would require this court to substitute its judgment for that of the co-lead agencies on whose expertise the Board of Estimate properly relied as lead agency for the purposes of the SEQRA review. This we will not do, as such action is beyond the limited scope of our review in this matter *(Matter of Neville v Koch, supra; Akpan v Koch, supra).*

Further, petitioners have not shown that the respondents failed to take the requisite "hard look" at the environmental effects of the proposed amendments to the City's Zoning Resolution, or that the final approval of the amendments, issued on the basis of the CPC's report and the Negative Declaration issued by the DEP and DCP, was affected by an error of law or was arbitrary and capricious or an abuse of discretion.

Generally, a Negative Declaration is a determination that the proposed action would not have a significant environmental impact. SEQRA and CEQR set out the criteria for the issuance of a Negative Declaration *(see generally,* ECL 8-0109

[4]; 8-0113 [2] [b]; 6 NYCRR 617.11 [c]; CEQR § 6 [a]). An EIS is required when an action can reasonably be expected to lead to any of the impacts listed in the regulations (CEQR § 6 [a]; 6 NYCRR 617.11 [a]). If an agency issues a Negative Declaration it must provide a reasoned elaboration for the basis of its determination *(Chinese Staff & Workers Assn. v City of New York,* 68 NY2d 359, 363-364). In this case the Negative Declaration was issued by the DEP and DCP after their review of the Project Data Statement.

The Project Data Statement (PDS), prepared pursuant to Mayor's Executive Order No. 91, stated that the proposed amendments would allow the potential development of scientific research and development facilities in areas zoned C6. Development would not be allowed as of right, but would require the issuance of a special permit, granted only after separate discretionary review and approval in accordance with ULURP and CEQR review procedures. It was noted therein that the Zoning Resolution then presently allowed limited laboratory investigation and testing (Use Group 9) and custom manufacturing uses, such as the production of medical and dental appliances and instruments (Use Group 11), in areas zoned C6, but did not allow research or product development and distribution. Such uses were considered light manufacturing uses and were relegated to areas zoned for manufacturing. However, it was proposed that scientific uses would benefit from centralization and would generally not create any objectionable influences in that the uses typically involve products with a high ratio of value to bulk, resulting in a minimum of truck traffic. The PDS proposed that the projected facilities be established in C6 areas by way of a special permit as a custom manufacturing use (Use Group 11).

It was stated in the PDS that:

"Any requests for a special use permit for a scientific research and development facility shall be subject to the following conditions:

"1. The project site must have a minimum lot area of 40,000 square feet or occupy an entire block;

"2. No residential use shall be located anywhere within the facility;

"3. The application for the uses permitted pursuant to the special permit specifies all applicable regulatory and licensing restrictions imposed on the proposed activities by other city, state and federal agencies;

"4. All activities relating to the scientific research and development facility shall be conducted in fully enclosed buildings, except parking, and shall conform to the performance standards applicable to M1 [manufacturing];

"5. All waste materials will be properly retained within closed containers in a fully enclosed structure prior to their disposal.

"Prior to granting the special permit, the [City Planning] Commission shall find that:

"1. The facility shall not impair the essential character use the abutting properties *[sic]*;

"2. The facility shall not be incompatible with or adversely affect growth and development of the surrounding area;

"3. Such facility is to be located as to draw a minimum of vehicular traffic to and through local streets."

The PDS stated as well that in order to promote public health and safety the City Planning Commission would require additional conditions and safeguards before granting the special permit.

The Negative Declaration issued by the DEP and DCP was based on their review of the PDS and indicated that the zoning text amendments, in and of themselves, would not have a significant impact. In the Negative Declaration, it was noted that the text amendments would have City-wide application. The conclusion that the proposed amendments would have no significant environmental impact was based primarily on the fact that the amendment would not allow "as of right" development, but would require the issuance of a special permit by the CPC.

■ It is well settled that requests for special permits for uses not permitted as of right, as well as other discretionary acts, require further environmental review *(see, Matter of Neville v Koch, supra,* at 426, n 6; *Matter of E.F.S. Ventures Corp. v Foster,* 71 NY2d 359; *Matter of Parkview Assocs. v City of New York,* 71 NY2d 274). Such review was conducted in this case, in connection with the cosponsors' application for the special permit, Zoning Map changes and land disposition required for the project. While the site-specific environmental review was done contemporaneously with the application for the amendments to the Zoning Resolution, there is no prohibition against proceeding in that manner, and petitioners can point to no resulting inequity or prejudice based upon that procedure.

It is noteworthy, that in the Negative Declaration it was stated that, "scientific research and development facilities may benefit from locating near existing medical or academic institutions which are themselves generally not located in manufacturing districts." While the text amendments were revised, these revisions were technical revisions in the format of the zoning amendments, to make them more consistent with other special permits, and to clarify the requirements necessary for a facility to be considered a scientific research and development facility. The DEP and DCP issued a statement that the revisions would have no significant impact on the environment and that the original Negative Declaration remained valid.

The City Planning Commission conducted a public hearing on the proposed text amendments after the text amendments were provided to various Community Boards in the vicinity of the project, and their comments were received. Thereafter the CPC issued its own report in which it reviewed the Negative Declaration issued by the DEP and DCP as well as the written comments received from the Community Boards that reviewed the proposed text changes. The CPC ultimately resolved that the text amendment would have no significant effects on the environment. The resolution was based, like the Negative Declaration, on the fact that development pursuant to the amendment would be allowed only upon issuance of a special permit by the CPC. The CPC report set out the general parameters upon which a special permit would be granted as follows:

"Under the proposed amendment, the Commission would allow, by special permit, a scientific research and development facility within a C6 district, if the proposed use meets the following preconditions:

"1. were located on a lot comprising an area of at least 40,000 square feet or an entire block;

"2. were located within a fully enclosed structure;

"3. conformed to the performance standards applicable to M1 districts;

"4. provided adequate parking and loading facilities;

"5. presented no material risk to public health.

"In addition, as a condition for granting the special permit the Commission would also be required to find that the scientific research and development facility:

"(a) would not unduly [a]ffect the essential character or

impair the future use and development of the surrounding area;

"(b) would be located as to draw a minimum of vehicular traffic to and through local streets; and

"(c) provide fully enclosed off-street loading berths and fully enclosed spaces for the storage of all raw materials, finished goods, byproducts and waste materials including debris, refuse and garbage."

The Commission also expressly reserved the right to impose additional conditions and safeguards and more restrictive performance standards where necessary. Furthermore, the CPC specifically noted "that any development that may occur under the proposed zoning amendment is contingent upon a special permit and would thereby be automatically subject to full land use (ULURP) and environmental (CEQR) review at the time of the application".

The Board of Estimate, after receiving the CPC report and the Negative Declaration from the DEP and DCP then conducted its own public hearings on the text amendments. Thereafter the Board of Estimate approved the amendments. The above makes it abundantly clear that the Board's action in approving the zoning amendment was the result of a proper review process which included appropriate opportunity for public review and comment, and was therefore rationally based.

Petitioners' technical challenge to the site-specific zoning and property disposition action taken by the respondents is directed toward the Notice of Completion of the DEIS required pursuant to CEQR § 10 (a). Petitioners contend that the Notice of Completion was deficient because it failed to specify the location for receipt of comments in the DEIS and failed to state the public review and comment period. In addition it is contended that the cover sheet of the DEIS did not state the date by which comments on the DEIS could be submitted.

CEQR § 10 (a) provides that upon completion of the DEIS the lead agencies shall immediately prepare, file and make available for public inspection a Notice of Completion. The Notice of Completion must contain the following:

"(i) an action identifying number;

"(ii) a brief description of the action;

"(iii) the location of the action and its potential impacts and effects; and

"(iv) a statement that comments on the draft EIS are

requested and will be received and considered by the lead agencies at their offices. The Notice shall specify the public review and comment period on the draft EIS, which shall be for not less than 30 calendar days from the date of filing and circulation of the notice, or not less than 10 calendar days following the close of a public hearing on the draft EIS, whichever last occurs." (CEQR § 10 [a] [1].)

The Notice of Completion in this case, which was issued on February 28, 1990, describes the project and its location, identifies the likely significant adverse environmental effects resulting from the project and provides the names, addresses, and telephone numbers of two officials, one each from the DEP and DCP, who were contact persons for the purposes of public comment. The Notice also contained a statement which: (1) identified the applicable regulations of CEQR and SEQRA, as well as the applicable Executive Order; (2) stated that the DEIS was completed and available for public inspection at a designated location; (3) stated that the proposal required the approval of the CPC and BOE pursuant to the ULURP; and (4) stated that a public hearing would be held in conjunction with the CPC, that notice would be given as to the date, place and time of the hearing and that there would be a 10-day public comment period following the public hearing.

The DEIS and Notice of Completion do not set out either the date of the public hearing for the DEIS or the precise dates of the comment period following the public hearing. The apparent reason for the omission is that SEQRA regulations provide that review pursuant to SEQRA and local review, in this case pursuant to the ULURP, are to be integrated as much as is practicable (ECL 8-0109 [5]; 6 NYCRR 617.4 [b]), and that in this case the two review procedures were conducted simultaneously. Consequently, the public hearing on the DEIS pursuant to CEQR/SEQRA and the City Planning Commission public hearing, required under the City Charter for ULURP purposes, are generally and were in this case, consolidated. Pursuant to ECL 8-0109 (5) public review is to commence after the completion of the DEIS. CEQR § 10 (a) provides that the ULURP process shall not commence until the Notice of Completion is filed. However, prior to September 1, 1990, a land use application under the ULURP (New York City Charter § 197-c) was subject to review by the affected Community Board, the City Planning Commission and the Board of Estimate. The commencement of each successive review was dependent on completion of the prior review.

Therefore, since the ULURP review had not yet begun when the DEIS and Notice of Completion were published, no date for the public hearing could be given in the Notice of Completion of the DEIS.

SEQRA (6 NYCRR) § 617.4 (b) allows for some flexibility in order to coordinate the SEQRA and local reviews. The regulation states: "An agency may by local law, code, ordinance, executive order, resolution or regulation vary the time periods established in this Part for the preparation and review of SEQR documents and for the conduct of public hearings in order to coordinate the SEQR environmental review process with other procedures relating to the review and approval of actions. Such time changes shall not impose unreasonable delay."

For example, even though SEQRA regulations contain the requirement that the cover sheet of the DEIS indicate the date until which comments on the DEIS must be submitted, the fact that CEQR has no such requirement (see, CEQR § 9 [a]) does not give rise to a conflict.

Respondents correctly emphasize that under SEQRA and CEQR the Notice of Completion is not meant to be the primary means of public notice of the completion of the DEIS and the opportunity for comment (6 NYCRR 617.10; CEQR § 10 [c]). Notice of the public hearing may be communicated to the general public by a Notice of Public Hearing which is distributed in the same way as the Notice of Completion and which must also be published at least 10 calendar days in advance of the hearing in a newspaper of general circulation (CEQR § 10 [a], [c]).

The DEP and DCP as co-lead agencies issued a Notice of Public Hearing on the DEIS on April 10, 1990. The Notice was published in the New York Daily News on April 16, 1990, and in the City Record from April 18 to May 1, 1990. Review of the notice shows that it stated that the hearing would take place on May 2, 1990, at 10:00 A.M. at the Board of Estimate Chambers. It provided detailed information concerning the Audubon Research Building project and included all of the relevant information concerning contact persons at the co-lead agencies. The Notice expressly stated that comments on the DEIS could be offered in person at the Planning Commission hearing or in writing to the co-lead agencies.

It is clear that the public review and comment period on the DEIS in this case exceeded that required by CEQR § 10 (a).

Therefore, judging the respondents' compliance with the requirements of SEQRA/CEQR according to a "rule of reason", *(Akpan v Koch, supra,* at 570), we find that the essential requirements concerning public notice have been met and the omissions in the Notice of Completion and cover sheet of the DEIS are not fatal to the entire environmental review procedure *(Business & Community Coalition to Save Brownsville v New York City Dept. of Envtl. Protection,* 173 AD2d 586). Petitioners had adequate actual notice and in fact fully participated in the public review and comment procedure.

Accordingly, the judgment of Supreme Court, New York County (C. Beauchamp Ciparick, J.), entered October 2, 1991 should be affirmed, without costs and disbursements.

SULLIVAN, J. P., SMITH and RUBIN, JJ., concur.

Judgment of the Supreme Court, New York County, entered on October 2, 1991, is affirmed, without costs and without disbursements.