OPINION OF THE COURT
Kaye, J.
The agency "action” triggering the Environmental Impact Statement (EIS) in issue on this appeal is a legislative act— New York City’s proposed rezoning of a full City block located *420 on West 42nd Street (the Site), from medium-density manufacturing to high-density commercial and residential. Petitioners’ challenge calls upon us to answer two questions. First, where at the time of rezoning there were no actual projects yet proposed for the Site and SEQRA review was premised on hypothetical uses, was it proper to approve the rezoning unconditionally, or should it have been subject to further review based on later specific projects? Second, was the review adequate with respect to offsite displacement?[1]
 We conclude that the City’s environmental review in both respects satisfied SEQRA, and that the Appellate Division order approving the rezoning should be affirmed.
I.
Presently a grade-level, 600-car parking lot, the Site is part of the Special Clinton District, a designation created in 1974 in response to community concern over several major projected developments in the area (see, NY City Zoning Resolution § 96.00 et seq.). The 1974 Zoning Resolution creating the special district was intended to preserve the character of the core residential area while promoting the most desirable land use and protecting the City’s tax revenues, by directing future development to underutilized sites at the community’s perimeter (see, "The Special Clinton District: Planning and Zoning Study,” at 1 [1985]; see also, Asian Ams. for Equality v Koch, 72 NY2d 121, 129 [special districts]; Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 419).
To accomplish these goals, the district — bounded by Eighth to Twelfth Avenues and 41st to 58th Streets — was subdivided into five areas: preservation, perimeter, mixed use, excluded and "other.” The Site was initially located in the district’s "other” area, governed by the underlying zoning designation M2-3 (medium-density manufacturing), and later included in the "perimeter” area.
In 1984, while the Jacob Javits Convention Center-just two blocks south of the Special Clinton District — was under construction, the Department of City Planning (DCP) issued a *421 study entitled "The Convention Center Area: Recommendations for Land Use, Zoning and Development,” designed to identify land use and development strategies that would support the Convention Center and complement current area land uses. Included in this report was a recommendation that the Site be rezoned from M2-3 to C6-4 (high-density commercial and residential) to allow "mixed-use development at substantially increased density.” Rezoning would complete the "42nd Street Corridor,” an area along 42nd Street running from the East River to the Hudson River, zoned C6-4 or other designation authorizing development of equal or greater density.
After DCP’s recommended rezoning, Silverstein Properties, Inc.[2] acquired the Site and formulated plans for a 1,600-unit residential development, but changes in the real estate market caused it to abandon the proposal. Silverstein had no actual project in April 1988, when it applied for rezoning from M2-3 to C6-4.
The EIS Process
Under the City’s environmental review procedure, DCP and the Department of Environmental Protection (DEP) act as co-lead agencies. The agencies worked with Silverstein’s experts in preparing a 700-page Draft Environmental Impact Statement (DEIS).
The Site’s M2-3 zoning classification entitled the owner to construct a medium manufacturing facility with a floor area ratio (FAR) of two (see, NY City Zoning Resolution § 41-12).[3] A C6-4 classification allows a wide range of retail, commercial, amusement, residential and mixed uses (see, NY City Zoning Resolution § 31-16). If rezoned from M2-3 to C6-4, the Site would have a 10 FAR minimum, with a 12 FAR maximum available if the owner met certain bonus requirements. The rezoning would also entitle Silverstein to receive a building *422 permit "as of right” for any of the C6-4 uses approved in the Zoning Resolution.[4]
When the action subject to environmental review is a rezoning, the City as a matter of policy requires that the EIS include analysis of a project reflecting what the City considers a reasonable full build-out of the allowable floor area. According to the City, this procedure is followed even where the applicant proposes a project that is less dense than allowed as-of-right under the requested zoning. In that event, a conceptual project using the maximum allowable zoning square feet is treated as the project, with the actual proposal viewed as an alternative. In that manner, the City seeks to insure that the full range of what it considers reasonable as-of-right development is subject to environmental review.
Following this policy, DCP and DEP elected to study the environmental impact of four hypothetical "worst case” scenarios. The four conceptual programs described in the EIS comprise two basic designs: a two-tower office plan and a four-tower residential plan, with each plan studied at 10 and 12 FAR levels.
The DEIS addressed the impact the hypothetical projects would have on land use, zoning and neighborhood characteristics; urban design; demographics, economics and secondary displacement; community resources; open space and recreational facilities; waterfront revitalization; transportation; air quality; noise; utilities; and energy resources. In addition to the four full-build hypothetical projects, DCP and DEP included five alternatives showing particular impacts as well as a "no build” hypothetical. Finally, the DEIS included recommended mitigation measures, and discussed irretrievable commitments of resources.
In November 1988, DCP and DEP issued a Notice of Completion of the DEIS and made copies available to the public (6 NYCRR 617.10 [c], [d]). Community resistance to the proposed rezoning was voiced at public hearings held in January and February 1989; the EIS was then expanded to respond to *423 public comments, particularly with respect to offsite displacement. A Notice of Completion of the Final Environmental Impact Statement (FEIS) (6 NYCRR 617.10 [f]) followed several months later. The EIS concluded that "[n]o project allowed in the C6-4 zone would have impacts greater than those discussed in the EIS for the worst case developments.”
Although acting to assist the Board of Estimate in the review process, the DCP and DEP had no decisionmaking authority. Rather, the Board of Estimate — at that time charged with responsibility as lead agency — had final authority with respect to use, development and improvement of City land, including changes in the Zoning Resolution (see, Akpan v Koch, 75 NY2d 561, 574-575; Matter of Coca-Cola Bottling Co. v Board of Estimate, 72 NY2d 674, 679).
Prior to final determination by the Board of Estimate, Silverstein agreed to a "Restrictive Declaration” imposing certain design restrictions on any future project and obligating it to cooperate in proposed mitigation measures; the owner was also limited to the development bonuses available in the Special Clinton District’s "perimeter” area. In an "Easement and License” agreement, Silverstein granted the City an easement over a portion of the Site for use as a new right-turn lane from Twelfth Avenue onto 42nd Street. On May 4, 1989, at a public hearing before the Board of Estimate, it was revealed that the Manhattan Borough President had secured an additional restriction governing a stepdown in height approaching Twelfth Avenue for any project on the Site, to ensure that development remained consistent with the City’s planned westside roadway and esplanade as well as its general plan for development of the waterfront area.
At the close of the hearing — four years after inception of the environmental review process — the Board of Estimate resolved unanimously to approve the rezoning. As the resolution recites, the actions approved were the ones that minimized or avoided adverse environmental impacts to the maximum extent practicable, and the adverse impacts revealed in the EIS would be minimized or avoided by incorporating as conditions to the decision the mitigation measures identified as practicable (see, 6 NYCRR 617.9 [c] [3], [4]).
The Present Litigation
Petitioners, seven Clinton residents and the owner of a small business in the area, brought this CPLR article 78 *424 proceeding challenging the Board of Estimate’s action. Supreme Court rejected their challenge, concluding that the Board of Estimate had taken the required "hard look” at the potential impact of the rezoning on secondary displacement as well as other environmental concerns required by SEQRA. While refusing to invalidate the action, the court held that no future construction could take place on the Site "that is in any way different from the four conceptual 'worst case’ scenarios set forth in the EIS, other than similar projects smaller in size, unless and until the agency * * * examines the changes between the proposed construction and that considered in the four 'worst case’ scenarios considered in the EIS, and after a 'hard look’ determines whether the changes result in possible adverse consequences that may have a significant impact on the environment, and if so, files a SEIS [Supplemental Environmental Impact Statement].” (150 Misc 2d 103, 108.)
Agreeing that the requisite hard look was taken, the Appellate Division held that Supreme Court erred in requiring the lead agency to take another hard look at zoning changes once actual plans for the Site were formulated. The court concluded that "the ten possibilities considered by the City were designed to represent the full panoply of possible uses to which the Silverstein defendants could put the site, thus covering the full range of environmental impacts, including the most environmentally destructive uses to which the property could be put.” (173 AD2d 323, 325.) We agree.[5]
II.
The applicable standards of judicial review are well settled and require only brief summary.
In a statutory scheme whose purpose is that the agency decisionmakers focus attention on, and mitigate, environmental consequences, it is the role of the court not to weigh the desirability of proposed action or choose among alternatives, but to assure that the agency itself has satisfied SEQRA, procedurally and substantively. Substantively, the courts in this limited adjudicative function must assure that the agency *425 has identified the relevant areas of environmental concern, taken a "hard look” at them, and made a reasoned elaboration of the basis for its determination. An agency’s responsibility under SEQRA must be viewed in light of a "rule of reason”; not every conceivable environmental impact, mitigating measure or alternative, need be addressed in order to meet the agency’s responsibility. The degree of detail — the reasonableness of an agency’s action — will depend largely on the circumstances surrounding the proposed action.
We next apply these standards to the "finality” question, and then to the displacement question.
The Finality Question
Petitioners’ challenge is not so much to the present adequacy of the City’s SEQRA review as to its finality. As both the trial court and the Appellate Division unanimously concluded, the City’s lengthy, extensive environmental review, including public hearings and thousands of pages of analysis, met SEQRA’s standards, in that the lead agency focused attention on and mitigated relevant areas of environmental concern. Rather, looking to the future, petitioners’ challenge is directed at the open-ended nature of the agency action, and it arises from a novel intersection of zoning concerns and environmental concerns.
As a matter of zoning, municipalities generally plan for and define the uses permitted in an area far in advance of particular projects. "The function of land regulation is to implement a plan for the future development of the community”; actual development in accordance with a well-considered plan may not proceed for years (Asian Ams. for Equality v Koch, 72 NY2d, at 131, supra; see, Marcus, 'Neville v. Koch’ Worst Case Analysis Zoning: A Farewell to As of Right% NYLJ, Mar. 6, 1991, at 1, col 1).
By the same token, a mainstay of New York City’s policy for zoning unimproved land is as-of-right development (Department of City Planning, "Zoning Handbook: A Guide to New York City’s Zoning Resolution”,. at 5; see also, Marcus, op. cit.). What is contemplated by this policy is that, so long as the proposed use is one of the "Uses Permitted As of Right” in the City’s Zoning Resolution, a developer who also satisfies the Building Code can simply file its architectural plans with the Department of Buildings and begin construction upon issuance of a building permit. (Id.; see also, Note, Zoning in the Fourth *426 Dimension, 3 Pace Envtl L Rev 75, 81, n 30; Gerrard, Ruzow and Weinberg, Environmental Impact Review in New York § 3.01 [3] [f].) The advantage of as-of-right development is predictability: development can proceed "in accordance with pre-set regulation rather than with case-by-case exercise of discretion by officials.” (Marcus, op. cit., at 1, col 1.)
As a matter of environmental law, rezoning is an "action” subject to SEQRA (see, Matter of Kirk-Astor Dr. Neighborhood Assn. v Town Bd., 106 AD2d 868, appeal dismissed 66 NY2d 896). This is consistent with SEQRA’s goal to incorporate environmental considerations into the decisionmaking process at the earliest opportunity (6 NYCRR 617.1 [c]; see, Matter of Long Is. Pine Barrens Socy. v Planning Bd., 78 NY2d 608, 615). Thus, SEQRA review of a rezoning "action” may take place long before any actual project is proposed. In that event, environmental review may be conducted on a conceptual basis (see, e.g., Matter of Brew v Hess, 124 AD2d 962, 965; Matter of Kirk-Astor Dr. Neighborhood Assn. v Town Bd., supra). In the present case, 10 hypothetical uses were studied in the EIS.
Further, as a matter of environmental law, actions requiring SEQRA review do not include "ministerial acts,” defined as "action[s] performed upon a given state of facts in a prescribed manner imposed by law without the exercise of any judgment or discretion as to the propriety of the act” (6 NYCRR 617.2 [x]; see, ECL 8-0105 [5] [ii]). Issuance of a permit by the New York City Department of Buildings for a use within the Zoning Resolution and the Building Code would be a ministerial act requiring no further SEQRA review (see, Matter of Filmways Communications v Douglas, 106 AD2d 185, affd 65 NY2d 878; Matter of Schum v City of New York, 161 AD2d 519; see also, Matter of Pius v Bletsch, 70 NY2d 920, 922). Thus, once the site is rezoned, under the New York City Zoning Resolution the owner can undertake any of the numerous "Uses Permitted As of Right” by the Zoning Resolution with no further environmental review. The owner will not be bound by or limited to the hypotheticals studied in the EIS.[6]
Petitioners urge that action of this sort is a "blank check” that contravenes SEQRA; they ask that we require — as the *427 trial court did — supplemental environmental review if actual projects, as they materialize, are different from the hypotheticals, other than similar projects smaller in size. Respondents counter that petitioners’ proposed continuing review is not only unauthorized under SEQRA but also invites perpetual litigation and consigns the Site, as well as the City’s zoning policy, to limbo.
We reject petitioners’ proposition. Even assuming the Board of Estimate had authority to impose subsequent environmental review as a condition of its approval,[7] and even assuming in particular cases that circumstances surrounding a proposed action might justify such a condition, there is no hard-and-fast rule requiring supplemental review whenever zoning is "projectless,”[8] and no basis for requiring it here.
Even when agency action involves a specific project, SEQRA review to some extent must take into account unknowns, which are circumscribed by a rule of reason; only environmental effects that can reasonably be anticipated must be considered. That principle applies as well where the agency action does not involve an actual project. We agree with the Appellate Division that, in this case, the agency discharged its statutory responsibility by studying hypothetical projects designated by DCP and DEP as the reasonable "full-build” uses for the Site — a range of worst-case hypothetical that reasonably could be anticipated to be built there. Petitioners now speculate about possibly more environmentally threatening uses that are permitted under the Zoning Resolution,[9] arguing that those must not escape SEQRA review.
*428 There may be instances where the procedure followed here would not be adequate because the future impact of the rezoning could not be forecast from hypothetical projects with reasonable accuracy. We cannot say in this case, however, that the agency’s choice of worst-case scenarios the City experts considered reasonable for the Site — which then became the focus of the EIS — was arbitrary or capricious or a violation of law (see, Matter of Industrial Liaison Comm. v Williams, 72 NY2d 137, 143).
In addition to the conceptual alternatives studied, the Board of Estimate relied on the Restrictive Declaration agreed to by Silverstein (see generally, Collard v Incorporated Vil. of Flower Hill, 52 NY2d 594, 599 [municipal rezoning conditioned on execution of a private declaration of covenants restricted the use to which rezoned parcel might be put]). These restrictions purport to mitigate the adverse environmental effects of any structure erected on the Site by including certain construction requirements and obligating Silverstein to cooperate in proposed mitigation measures. A failure to cooperate in such measures would result in denial of a certificate of occupancy. The Restrictive Declaration, moreover, ensures that the actual project will conform to the City’s over-all plan for the Clinton District, directing development to underutilized sites which could sustain a higher level of construction while encouraging preservation of those areas with a special architectural scale or character (see, "The Special Clinton District: Planning and Zoning Study”, op. cit.).
Thus, we conclude that the lead agency identified and sought to minimize the significant environmental impacts that might result from the proposed rezoning. Its determination was rational, supported by substantial evidence, and legally sufficient.
The Displacement Question
Petitioners contend that, although the City did address offsite displacement at the FEIS stage, only a truncated portion of the geographical area was actually studied for this purpose, and review was therefore inadequate. We agree with both Supreme Court and the Appellate Division that this contention lacks merit.
As the record reflects, DCP initially applied a quarter-mile rule as the geographic boundary within which the displacement of area residents could reasonably be expected to occur, *429 concluding from its study that rezoning the Site would not significantly affect offsite displacement. As the DEIS noted, any offsite displacement would be primarily the result of "the entire area’s overall improvement.”
In response to public comments, a field study was undertaken of a portion of the initial area studied and the EIS expanded to reflect the results; the study confirmed that there was little low-income residential use in the immediate vicinity of the Site, that virtually all the apartments were rent-protected, and that as to the 14 unprotected apartments the rezoning would not contribute appreciably to the risk of displacement. The FEIS also explained the choice of a more limited field study area, noting that beyond its borders other factors — including the Convention Center and the Times Square redevelopment — "eclipse the displacement impacts of development” at the Site. That conclusion was based in part on earlier sections of the FEIS.
The City Planning Commission thereafter conducted its own study of offsite diplacement and issued a lengthy report, concluding that the rezoning would be unlikely to have significant impact on offsite displacement. Finally, the issue was again raised at the hearing before the Board of Estimate, where the field study was discussed.
Petitioners’ assertion that the review of offsite displacement was improperly truncated must be rejected. The geographical area selected for the field study was consistent with the initial study and was used only for confirmation purposes. When placed in context of the City’s over-all review of offsite displacement, it is clear that the City conducted the requisite investigation and reasonably exercised its discretion (see, Akpan v Koch, 75 NY2d, at 571, supra).
Accordingly, the order of the Appellate Division should be affirmed, with costs.
Chief Judge Wachtler and Judges Simons, Titone, Hancock, Jr., and Bellacosa concur.
Order affirmed, with costs.

. "Offsite” or "secondary” displacement refers to the potential displacement of local residents other than that caused by actual construction on the site (see, Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 367).00

. Silverstein Properties, Inc., the owner, and its affiliate Silverstein 42nd Associates, a real estate development firm, are intervenors in the present action. "Silverstein” refers to both the owner and the developer of the Site.

. FAR expresses the relationship between the amount of floor area permitted in a building and the size of the lot on which the building stands. For example, a 10 FAR designation would allow 100,000 square feet of floor space on a 10,000 square-foot lot (see, NY City Zoning Resolution § 12-10).

. In many cases, rezoning a parcel does not of itself permit physical development, as further regulatory approvals will likely be required prior to construction. "As-of-right” building describes a development which complies with the local zoning requirement and for which the Building Department may issue a permit without having to refer to the Planning Commission or the Board of Standards and Appeals (see, Gerrard, Ruzow and Weinberg, Environmental Impact Review in New York § 3.01 [3] [f]; Note, Zoning in the Fourth Dimension, 3 Pace Envtl L Rev 75, 81, n 30 [1985]).

. Numerous additional challenges to the City’s environmental review process were made in the article 78 proceeding, but are not pursued on this appeal. Additionally, petitioners brought a plenary action attacking amendment of the Zoning Resolution as not pursuant to a well-considered plan. Both the trial court and the Appellate Division rejected that argument, a ruling petitioners do not challenge.

. Of course, requests for variances and special permits for uses not permitted as of right, as well as other discretionary actions, would not be "ministerial acts” and would call for further review (see, Matter of E.F.S. Ventures Corp. v Foster, 71 NY2d 359; Matter of Parkview Assocs. v City of New York, 71 NY2d 274).

. This appeal does not require us to determine whether the City would have the authority to require supplemental environmental review in the future if it learned of a significant adverse effect omitted from the FEIS (see, Gerrard, Ruzow and Weinberg, Environmental Impact Review in New York § 3.13 [4]; see also, Snider and Levine, A Prolegomenon to Understanding the Developer’s True Statutory Responsibilities Under SEQRA, 5 Touro L Rev 255 [1989]).

. As Supreme Court noted, the rezoning is not an action that authorizes a generic EIS, which would require the filing of an SEIS under certain circumstances (see, 6 NYCRR 617.15). This regulation should not be used to graft a supplemental review requirement onto "analogous” situations.

. Of petitioners’ examples on appeal, construction of an amusement park is not permitted in a C6-4 zone, although a small amusement park could have been built on the Site prior to rezoning (see, Zoning Resolution §§ 32-22, 32-24, 32-32, 42-12, 73-26, 74-44). Petitioners also posit "the tallest building in the world,” which the City’s expert noted could not be built on the Site. The EIS contained — as a reasonable single-structure alternative — a 70-story single tower conceptual project.