[720 NYS2d 50]

In the Matter of JOHN FISHER et al., Respondents, v RUDOLPH GIULIANI, as Mayor of the City of New York, et al., Appellants. RESNICK EIGHTH AVENUE ASSOCIATES, L. L. C., Proposed Intervenor-Appellant.

First Department, January 25, 2001

## APPEARANCES OF COUNSEL

*Stephen P. Kramer* of counsel (*Antonia Levine Bryson*, attorney), for respondents.

*Robin Binder* of counsel (*Elizabeth I. Freedman* and *Leonard Koerner* on the brief; *Michael D. Hess, Corporation Counsel* of New York City, attorney), for appellants.

*Jeffrey L. Braun* of counsel (*Jennifer B. Arlin* on the brief; *Rosenman & Colin, L. L. P.*, attorneys), for proposed intervenor-appellant.

*David Paget* of counsel (*Steven Russo* on the brief; *Sive, Paget & Riesel, P. C.*, attorneys), for Shubert Organization and others, *amici curiae*.

*Alice R. Thomas* of counsel (*Holly M. Leicht* and *T. Gorman Reilly*, attorneys), for Municipal Art Society of New York, Inc. and another, *amici curiae*.

### OPINION OF THE COURT

FRIEDMAN, J.

This appeal involves a challenge to recent zoning amendments affecting the Manhattan Theater District. Specifically, petitioners allege that the City was required to prepare an Environmental Impact Statement before implementing the changes to the New York City Zoning Resolution (ZR). For the reasons that follow, we conclude that, insofar as the amendments created a mechanism permitting the transfer, as of right, of a theater's development rights and implemented design controls, no Environmental Impact Statement was required. However, because the City failed to analyze the potential environmental impact of the amendments providing for special permits and discretionary authorizations, such amendments should be severed and annulled.

For more than 30 years, New York City has recognized the importance of the Manhattan Theater District—a district that, by some estimates, generates $2 billion in economic activity annually and employs, in the aggregate, 250,000 people. A crucial lynchpin in the success of the district is, of course, Broadway theaters.

The City's commitment to its theaters dates back at least to 1967, when it established the Special Theater District. Thereafter, in 1982, the City amended the Zoning Resolution in response to the destruction of several theaters. These amendments created a new "Theater Subdistrict" that restricted the demolition of designated theaters and attempted to make them more viable by permitting the transfer of development rights to nearby parcels. Over time, however, it became evident that the 1982 measures were insufficient to achieve the stated goal

of theater preservation. Thus, in 1998, further amendments to the Zoning Resolution were adopted in an effort to assure the vitality of this irreplaceable asset.

Unlike the earlier provisions of the Zoning Resolution, the 1998 amendments authorize the transfer of development rights from designated theaters to receiving sites anywhere within the Theater Subdistrict. Under the proposed amendments, the transfer is limited to a 20% increase in the base Floor-to-Area ratio (FAR) of the receiving site, inclusive of, or in combination with, all other as of right zoning incentives.[1] The transfer must be accompanied by the execution of a covenant ensuring the continued operational soundness of the transferring theater and its continued use as a legitimate theater, as well as a contribution to a Theater Subdistrict Fund that, among other things, will be used to monitor transferring theaters. As part of this plan, the Zoning Map was also amended to extend the western boundary of the Theater Subdistrict to include the west side of Eighth Avenue between 42nd Street and 45th Street, which is the westernmost fringe of the Special Clinton District,[2] a neighboring residential area.

In addition to the as-of-right transfer mechanism, an additional discretionary mechanism was also established in the Theater Subdistrict. Thus, at certain sites in the district, including sites on Eighth Avenue, a developer may obtain an additional 20% of the base FAR via special permit or discretionary authorization (see, ZR § 81-744 [b], [c]).

In crafting the amendments, the City Planning Commission (CPC), which is responsible for overall City development (NY City Charter § 192 [f]), was cognizant that the Special Clinton District consists, to a large extent, of smaller residential buildings. Because of this, the Theater Subdistrict amendments establish urban design controls such as street wall, height, and setback requirements. These design controls, which require the building base to be at least 50 feet high with setbacks above the base, would constrain tower-type construction that had been permissible under prior zoning provisions.

Before submitting the proposed amendments for public review, the CPC, through the Environmental Assessment and Review Division of the Department of City Planning (DCP),

---

1. Floor-to-Area ratio refers to the relationship between the amount of usable floor area that may be constructed in a building and the area of the lot on which the building stands.

2. Previously, the Theater Subdistrict only included the east side of Eighth Avenue.

conducted an environmental assessment as required by the State Environmental Quality Review Act (SEQRA) and our local regulations, the City Environmental Quality Review (CEQR). Under the statutory scheme, an Environmental Assessment Statement is prepared that sets forth the environmental analysis. If it is determined that the proposed action may have a significant effect on the environment (62 RCNY 5-05 [b]), the agency (here CPC) must then issue a positive declaration and an Environmental Impact Statement must be prepared before the proposed zoning may be adopted (43 RCNY 6-07 [b]). If, on the other hand, it is determined that the action will have no significant impact, the agency issues a negative declaration and no Environmental Impact Statement need be prepared (43 RCNY 6-07 [b] [1]).

To assess the potential environmental impact of the proposed zoning changes, the DCP examined the reasonable worst case scenario that could result under the as of right amendments and compared it with the development that would otherwise have occurred without the amendments. To do this, the DCP first identified those sites in the Theater Subdistrict where, because of location, market trends, and physical conditions, development was most likely to occur, with or without a change in zoning. It found that there were 23 such "soft sites," which currently had the capacity for 10.9 million square feet of residential and commercial floor area (assuming that each site was built to the maximum density permitted as of right). The DCP then considered the potential demand for additional development in the study area within the foreseeable future, that is, over the next 10 years.

To make these future projections, DCP examined development trends in the larger midtown area during the 10-year period between 1983 and 1993. The 10-year period was chosen because it reflected a full business cycle for midtown development, including periods of both significant and limited growth. Assuming that there would be a similar demand over the next 10 years, the DCP found that the existing zoning capacity could accommodate, more than twice over, the projected demand.

With regard to development under the proposed zoning, the DCP determined that the amendments did modestly increase the density of particular sites via the transfer of development rights from theaters. This, it was indicated, would likely induce builders to construct taller buildings to achieve the greatest economy of scale (i.e., by distributing the cost of the land over the largest possible building volume). However, this would not

affect overall market conditions and would not induce development beyond what was already likely to occur.

In this regard, while an individual developer might build to the maximum density on a particular site by purchasing development rights from a theater, collectively, developers would build only enough floor area to satisfy an overall unchanged market demand. Viewed otherwise, the higher density of specific sites would accommodate the projected demand for space—it would not change the overall demand.

Next, the DCP analyzed the potential impact that any development might have on traffic, transit, and air quality. Since it could not be predicted with certainty which of the sites would eventually contain the expected development, the DCP selected the reasonable worst case scenario. For modeling purposes, the DCP chose those sites located in areas where commercial and residential development were most likely to occur, and that were in close proximity to each other, thus giving rise to a concentrated effect.

Using this worst case scenario, the DCP concluded that any potential development would give rise to less than 50 peak-hour vehicle trips at any given intersection in the area. According to the CEQR Technical Manual, this was below the threshold requiring further analysis because it would not have a significant effect upon traffic and transit. Further analysis also determined that any additional traffic would have no significant impact on air quality.

As to the socioeconomic conditions of the area, the DCP analyzed whether the proposed amendments would lead to the displacement of area residents or businesses. Because the amendments would not induce development different in kind or magnitude from that which was already expected to take place, the DCP concluded that the change in zoning would not result in any significant displacement.

The findings and conclusions reached by the DCP resulted in a negative declaration, which was supported by an Environmental Assessment Statement that included a 75-page single-spaced report. Thereafter, the Environmental Assessment Statement and negative declaration were filed with a revised Land Use Review Application on January 8, 1998, and, in accordance with public review requirements (see, NY City Charter §§ 197-c, 201), referred for review to Community Boards Four and Five, the Manhattan Borough Board, and the Manhattan Borough President. After public hearings at which approximately 80 people testified both for and against the pro-

posal, and consideration of written submissions, the CPC adopted the proposed amendments on June 3, 1998.

The matter was then referred to the New York City Council pursuant to City Charter §§ 197-d and 200 (a) (2). By resolutions dated August 6, 1998, the Council, after a further round of public hearings involving the testimony of approximately 100 people, found that no significant environmental impact would result from the proposed action and approved the amendments and map change (subject to certain modifications). This litigation ensued.

Petitioners, among whom are residents of the neighboring Special Clinton District, commenced this CPLR article 78 proceeding, seeking to challenge the adequacy of the environmental review and consequent negative declaration. According to petitioners, the underlying analysis supporting the negative declaration was deficient and preparation of an Environmental Impact Statement was warranted. Petitioners also alleged that the proposed amendments were not within the scope of the City's zoning power.

Supreme Court, without reaching this latter argument, annulled the Theater Subdistrict Amendments and the zoning map change and directed the DCP to prepare an Environmental Impact Statement. In so doing, the court concluded that the amendments would stimulate development, relying, in large part, upon a newspaper article about the current state of the midtown real estate market.

Stripped to its essentials, the purported flaws identified by petitioners are threefold: first, that the DCP (which, as noted, prepared the environmental assessment) underestimated the projected market demand for development in the Theater Subdistrict; second, that the DCP erroneously determined that the amendments would not stimulate development beyond that which would already have occurred; and, third, that the DCP improperly limited its analysis to 10 years into the future and failed to consider that every single square inch of buildable space might, in fact, be developed. None of these claims has merit.

In analyzing a SEQRA determination, a court is required to sustain an agency's negative declaration unless the court concludes that it " 'was affected by an error of law or was arbitrary and capricious or an abuse of discretion' " (*Chinese Staff & Workers Assn. v City of New York*, 68 NY2d 359, 363, quoting CPLR 7803 [3]). Under this standard, it is not the role of the court to weigh the desirability of the proposed action, choose among alternatives, resolve disagreements among

experts, or substitute its judgment for that of the agency (*Matter of Neville v Koch*, 79 NY2d 416, 424-425; *Mobil Oil Corp. v City of Syracuse Indus. Dev. Agency*, 224 AD2d 15, 25, *lv denied* 89 NY2d 811, *appeal dismissed* 89 NY2d 860). Rather, the limited issue for the court's review is whether the agency identified " 'the relevant areas of environmental concern,' " took a " 'hard look'." at them, and made a "reasoned elaboration of the basis for its determination" (*Matter of Merson v McNally*, 90 NY2d 742, 751-752 [citations omitted]; *Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400, 416).[3]

Viewed against this analytical backdrop, we first address petitioners' claim that the DCP underestimated future demand in the Theater Subdistrict. This charge flows from petitioners' belief that historical development trends in the Theater Subdistrict are no longer meaningful. In this connection, it is asserted that the recent reduction in the number of adult establishments has made the Theater Subdistrict more attractive to developers. This argument, however, ignores the forecasting method used by the DCP.

In developing its projections, the DCP examined the larger midtown area, not just the Theater Subdistrict. Thus, in applying the historic trends of the midtown area to the much smaller Theater Subdistrict, it is uncontroverted that the DCP projected future growth in excess of historic levels. Hence, this conservative forecasting method necessarily took into account relatively recent changes in the Theater Subdistrict.

With regard to the claim that the as of right amendments will stimulate development, it is true that certain soft sites might enjoy greater profitability (because taller buildings may be permitted). It is also true that theaters will have a wider geographic area in which to sell their development rights. But these observations, without more, do not undermine the rationality of the DCP's determination that market demand and consequent development will remain relatively constant.

---

**3.** Although petitioners point out that the proposed zoning change, being a "Type I action," carries with it a presumption that it may have a significant effect on the environment (*see, Matter of Omni Partners v County of Nassau*, 237 AD2d 440, 442), the fact remains that our analysis must be guided by the aforementioned standards (*see, Matter of SoHo Alliance v New York City Bd. of Stds. & Appeals*, 95 NY2d 437; *Matter of Merson v McNally, supra*; *Matter of Neville v Koch, supra*; *Matter of Jackson v New York State Urban Dev. Corp., supra*). I note, in this regard, that petitioners themselves recognize this and concede that the question before us must be resolved under this standard of review.

As the CPC convincingly notes, potential zoning capacity will not induce development beyond that which would otherwise have occurred unless the demand for additional space exceeds current zoning capacity.[4] Since current zoning capacity already far exceeds demand, the CPC's central conclusion is rational. Moreover, petitioners failed to provide any meaningful evidence that the monetary savings realized from developing taller buildings would be significant enough to spur development beyond that which would in any event take place. This is especially so since the modest increases in floor area permitted by the proposed amendments would apparently result in only a few additional stories to new buildings.

Contrary to petitioners' claim, the CPC also properly considered the long-term impact of the proposed as-of-right amendments. At its core, petitioners' argument is that the CPC was required to look beyond 10 years from the enactment of the zoning amendments and assume that every single square foot of buildable area will eventually be developed, regardless of the likelihood that it will occur. This argument is without merit since the DCP was only obligated to examine environmental consequences into the foreseeable future, not to examine theoretical possibilities that were steeped in nothing more than unsupported speculation (*see, e.g., Matter of Schulz v New York State Dept. of Envtl. Conservation*, 200 AD2d 793, 795, *lv denied* 83 NY2d 758). To adopt a 10-year time frame was hardly an irrational examination of the long-term foreseeable future.

Petitioners' reliance upon *Matter of Neville v Koch* (79 NY2d 416, *supra*) in support of a contrary conclusion is misplaced. In *Neville*, which involved the rezoning of a full City block, the City considered the environmental impact that could result from a full build-out of the allowable floor area. Petitioners, pointing to this aspect of *Neville*, read the case as establishing a requirement that a full build-out be examined in every instance. This interpretation of *Neville* is erroneous.

The necessity to assume a full build-out in *Neville* was premised on the observation that developers will generally seek to build to the maximum capacity allowable. Thus, where the rezoning involves a discrete parcel of property, the necessity of assuming a full build-out is apparent. Where, however, the rezoning involves a larger geographic area, the underlying

4. Interestingly, the City's argument on this point is supported by its uncontroverted observation that the City has *never* been developed to its full zoning potential.

assumptions at play in *Neville* are no longer applicable. As previously noted, while any single developer will seek to develop its property to capacity should it choose to build, that does not mean, when dealing with the rezoning of a wider geographic area, that the entire area will be developed to full capacity. Development to full capacity will obviously not occur, because market forces act as a constraint. This being so, it was rational for the City to conclude that a full build-out of the Theater Subdistrict was constrained by economic forces.

What the foregoing reveals is that the DCP's detailed analysis, as reflected in the Environmental Assessment Statement, was entirely rational insofar as the as-of-right amendments were concerned. Hence, an Environmental Impact Statement was not required. This, however, does not conclude the matter.

■ As previously noted, in addition to the as-of-right transfer mechanism established by the zoning amendments, a discretionary mechanism was also established in the Theater Subdistrict. The DCP was of the view that no environmental review of these amendments was required because when an owner applied for a special permit, an assessment would be made at that time. Hence, the DCP believed that it could defer its analysis. This was error.

It is well settled that "SEQRA's goal [is] to incorporate environmental considerations into the decisionmaking process at the earliest opportunity" (*Matter of Neville v Koch*, 79 NY2d 416, 426, *supra*). Thus, the mere fact that environmental review may be required at the time an applicant seeks a special permit does not, by itself, obviate the CPC's obligation to consider possible environmental impact at the time it enacts the zoning changes, at least on a conceptual basis (*see, Matter of Eggert v Town Bd. of Town of Westfield*, 217 AD2d 975, *lv denied* 86 NY2d 710; *Matter of Brew v Hess*, 124 AD2d 962; *Matter of Kirk-Astor Drive Neighborhood Assn. v Town Bd. of Town of Pittsford*, 106 AD2d 868, *appeal dismissed* 66 NY2d 896; *cf., Matter of People for Westpride v Board of Estimate of City of N. Y.*, 165 AD2d 555, *lv denied* 78 NY2d 855).

In reaching this conclusion, we do not suggest that the grant of additional FAR beyond that permitted as of right would have a significant environmental impact. It may very well be that a grant of additional FAR will have no impact. But, whatever the case may be, the DCP was obligated to consider the matter *now*, not just in the future. In view of this, we turn to the remedy for this isolated error.

Zoning Resolution § 11-50 (a) provides that "if a court * * * finds any provisions of this Resolution to be invalid * * * all

other provisions of this Resolution shall continue to be separately and fully effective." Here, even though the DCP failed to examine the possible impact from future discretionary grants of FAR, this aspect of the Zoning Resolution was entirely discrete from the other provisions of the Resolution, i.e., those dealing with as-of-right transfers and those dealing with design controls. The discrete provisions relating to discretionary grants of FAR, therefore, should be annulled.[5] The balance of the Resolution should, however, remain effective.

█ Finally, we address petitioners' claim that the zoning amendments were not within the scope of the City's legitimate zoning power. Preservation of the Theater Subdistrict through zoning has long been recognized as an appropriate exercise of the City's zoning power (see, Asian Ams. for Equality v Koch, 72 NY2d 121, 129). The 1998 amendments to the Zoning Resolution merely represent the City's latest attempt to continue its 30-year tradition of protecting the character of one of New York's most valuable resources, the Broadway Theater Subdistrict. Since these amendments are directly related to this legitimate goal, petitioners' claim is without merit (see, City of New York v Delafield 246 Corp., 236 AD2d 11, 24-25, lv denied 91 NY2d 811; see also, Asian Ams. for Equality v Koch, supra).

In sum, because the DCP failed to analyze the potential environmental impact that could arise from discretionary grants of FAR, these provisions of the Zoning Resolution are severed and annulled. However, the remaining aspects of the Zoning Resolution, which include the as of right and design control provisions, were enacted after the DCP took a hard look at the relevant environmental concerns and made a reasoned elaboration for its determination that no impact would result. There is, therefore, no basis for annulling these provisions of the Zoning Resolution.

We have examined the remaining contentions for affirmative relief and find them to be without merit.

Accordingly, the judgment of the Supreme Court, New York County (William McCooe, J.), entered on or about July 21, 1999, which granted this article 78 petition to the extent of vacating and annulling respondents' adoption of the Theater Subdistrict zoning map change and text amendments, enjoining the transfer of development rights pursuant to the subject

---

5. In the event the City seeks to again promulgate these amendments, it must first prepare an Environmental Assessment Statement, and, if necessary, an Environmental Impact Statement (cf., Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, supra).

resolution, and directing respondent Department of City Planning to prepare an Environmental Impact Statement, should be modified, on the law, to the extent of vacating that part of the judgment enjoining the transfer of development rights, vacating the direction to DCP to prepare an Environmental Impact Statement, reinstating those provisions of the Zoning Resolution that amended the zoning map, reinstating the text amendments insofar as they concern the as-of-right transfer of theater development rights and design controls for the Theater Subdistrict, and otherwise affirmed, without costs, and the matter remanded to the City Planning Commission for further proceedings consistent with this Opinion. Appeal from order, same court and Justice, entered November 8, 1999, which denied respondents' motion to resettle the judgment and denied the motion of Resnick Eighth Avenue Associates seeking to intervene in the proceeding and for reconsideration of the judgment, should be dismissed as academic, without costs.

Motion seeking leave to file *amici curiae* brief granted.

MAZZARELLI, J. P., ANDRIAS, ELLERIN and LERNER, JJ., concur.

Judgment, Supreme Court, New York County, entered on or about July 21, 1999, modified, on the law, to the extent of vacating that part of the judgment enjoining the transfer of development rights, vacating the direction to respondent Department of City Planning to prepare an Environmental Impact Statement, reinstating those provisions of the Zoning Resolution that amended the zoning map, reinstating the text amendments insofar as they concern the as-of-right transfer of theater development rights and design controls for the Theater Subdistrict, and otherwise affirmed, without costs, and the matter remanded to the City Planning Commission for further proceedings consistent with this Opinion. Appeal from order, same court, entered November 8, 1999, dismissed as academic, without costs. Motion seeking leave to file *amici curiae* brief granted.