[741 NYS2d 186]

In the Matter of NEW YORK CITY COALITION TO END LEAD
POISONING, INC., et al., Respondents, v PETER VALLONE et
al., Appellants.

First Department, March 26, 2002

APPEARANCES OF COUNSEL

*Matthew J. Chachère* of counsel (*Kenneth Rosenfeld, Theodora Galacatos* and *James M. Baker* on the brief; *Northern Manhattan Improvement Corp. Legal Services,* attorneys), for respondents.

*Andrew Goldberg* for New York Public Interest Research Group, Inc., respondent.

*George Gutwirth* of counsel (*Francis F. Caputo* and *Mark W. Muschenheim* on the brief; *Michael D. Hess, Corporation Counsel* of New York City, attorney), for appellants.

*Charles N. Rock* of counsel (*Victoria Reilly Lehning* on the brief; *Rock & Rosmarin, L.L.P.,* attorneys), for Rent Stabilization Association of N.Y.C., Inc. and others, amici curiae.

*Simon Wynn* of counsel (*Peter Lehner* and *Gordon Johnson* on the brief; *Eliot Spitzer, Attorney General,* attorney), for State of New York, amicus curiae.

*Foster Maer* of counsel (*Sara Rios* on the brief; *Puerto Rican Legal Defense* and *Education Fund, Inc.,* attorneys), for Cathy Falvo and others, amici curiae.

## OPINION OF THE COURT

BUCKLEY, J.

The issue here is whether the procedures the City Council used to adopt Local Law No. 38 (1999) of the City of New York (Local Law 38) comply with the State Environmental Quality Review Act (SEQRA) and the City Environmental Quality Review (CEQR). Since we find that the record amply demonstrates respondents' compliance with the applicable environmental laws, we reverse and dismiss the petition.

This litigation is but the latest chapter in a decades-old conflict over what should be the policy of the City of New York regarding the public health threat posed by the lead content of paint. Here, however, it is undisputed that the policy should be containment rather than removal of lead paint because removal poses a greater threat than containment. This is the central premise of Local Law 38. Thus, the present dispute involves not the content of that policy, but rather how municipal policy can be changed.

Petitioners have sought to nullify amendment of lead paint standards and adoption of abatement methods on the ground that the procedures used to adopt that local law failed to comply with state and municipal environmental protection laws, namely the State Environmental Quality Review Act and the City Environmental Quality Review.

Petitioners challenge New York City's amendment of its lead paint laws through adoption of Local Law 38 in the summer of 1999. Petitioners claim that respondents should have formulated an environmental impact statement (EIS) prior to adoption of Local Law 38 and that the negative declaration, issued in lieu of an EIS, was defective under the relevant state and municipal laws (ECL 8-0101 *et seq.* [also known as SEQRA]; 6 NYCRR part 617; 43 RCNY 6-01 *et seq.* and 62 RCNY 5-01 *et seq.* [CEQR]). Insofar as relevant here, the claims and defenses made under CEQR are indistinguishable from those made under SEQRA. While Corporation Counsel for the City respondent has questioned whether these environmental review laws apply to local laws of general environmental impact, this issue was neither briefed nor argued before the IAS court and, in any event, was resolved years ago by regulatory definitions which expressly include local laws passed by governing authorities (6 NYCRR 617.2 [b] [3]; [v]; 62 RCNY 5-03 [d]; *cf. Matter of Niagara Recycling v Town Bd. of Town of Niagara*, 83 AD2d 335, 338 n 4, *affd* 56 NY2d 859; *see also, Williamsburg Around the Bridge Block Assn. v Giuliani*, 223 AD2d 64, 72). Prior to evaluating the parties' conflicting claims regarding SEQRA compliance, it is necessary to understand prior litigation concerning lead-based paint and to compare Local Law 38 with the ordinance it amended.

## PRIOR LITIGATION

Lead-based paint has long been identified as the source of serious health risks for very young children (*Juarez v Wavecrest Mgt. Team*, 88 NY2d 628, 640-641). The use of lead-based paint was first banned in New York City in 1960. In 1970 the City Department of Health was mandated by the Health Code to take certain actions when notified that lead poisoning had happened. The first systematic attempt at formulating municipal standards and methods of amelioration came in 1982 when New York City adopted Local Law No. 1 (1982) of the City of New York (Local Law 1), which, among other things, placed strict limits on the amount of lead that could be contained in the interior paint in any apartment with a child six years or younger. New York City's performance of its duties under Local Law 1 has been the subject of nearly two decades of litigation (*New York City Coalition to End Lead Poisoning v Koch*, 138 Misc 2d 188, *affd* 139 AD2d 404 [motion to dismiss on pleadings denied]; *New York City Coalition to End Lead Poisoning v Koch*, 170 AD2d 419 [City interpretation of ordinance

contrary to plain meaning of ordinance, ordered to promulgate regulations]; *New York City Coalition to End Lead Poisoning v Koch*, 216 AD2d 219 [civil contempt appropriate means to obtain compliance with injunctive relief]; *New York City Coalition to End Lead Poisoning v Giuliani*, 245 AD2d 49 [class certified, civil contempt sanctions]). Later the IAS court found that the City had violated both the statute and prior court decisions; the court thereupon enjoined certain Health Code amendments, held the City in contempt and imposed a fine which was to increase until the City was in compliance with earlier orders (*New York City Coalition to End Lead Poisoning v Giuliani*, 173 Misc 2d 235). It was against this litigation backdrop that the City decided to reformulate lead paint standards and enforcement methodologies.

Throughout the consideration of various alternative regulations and ordinances between December 1998 and June 1999, the final imposition of contempt remedies was delayed several times by the parties. Adoption of Local Law 38 mooted out the former litigation. Nullification of Local Law 38 by the IAS court in this proceeding, if affirmed, would reinstate Local Law 1 and place the City of New York in immediate contempt of outstanding orders in the former litigation. New York City would be without any effective and safe methods of dealing with the persistent lead paint hazards. It is essential, then, to understand the relationship between Local Law 1 and Local Law 38 to appreciate the legislative process which resulted in amendment of the former by the latter.

## LOCAL LAWS 1 AND 38

Local Law 1 of 1982, codified in Administrative Code of the City of New York § 27-2013 (h), required the owner of a multiple dwelling occupied by a child under age seven to eliminate all lead paint on specified interior surfaces. Unlike previous laws, owners had to completely remove lead paint regardless of whether a City inspection or lead poisoning had happened. Owners had to completely abate whenever a child resided where lead paint existed (*see, Juarez v Wavecrest Mgt. Team*, 88 NY2d 628; *Valdez v Sherman Estates*, 224 AD2d 240). In stark contrast with this total removal approach, Local Law 38 of 1999 reformulated municipal policy as one of containment: intact paint is to be left alone; peeling lead-based paint should be repaired rather than removed. Significantly, on this central premise of Local Law 38, petitioners and respondents agree, since experts on lead paint now concur that removal of

intact lead-based paint poses a greater public health threat than containment. What separates petitioners and respondents is not the City's abandonment of a total abatement approach but, rather, the details of how to measure risks presented by lead-based paint and how to contain those risks to ensure the safety of small children. The salient, undisputed point here is that moving from abatement to containment reduces environmental threats to human health. There is disagreement on whether certain standards, rules or methodologies will result in greater or lesser reductions of existing threats resulting from lead based-paint. There is no dispute over whether lead-based paint poses risks to human health and that municipal government should attempt to reduce those risks. There is no claim that any action undertaken or proposed by respondents would increase health risks beyond those already existing due to the use of lead-based paint by third parties. The parties dispute how best to reduce those risks. The issue decided by the IAS court and argued on appeal is whether respondents complied with procedures intended to ensure that "due consideration is given to preventing environmental damage" (ECL 8-0103 [9]; *compare Matter of Committee to Preserve Brighton Beach & Manhattan Beach v Planning Commn. of City of N.Y.*, 259 AD2d 26, 34-35 [reasoned elaboration found where each relevant environmental concern considered at some point during environmental review] *with Williamsburg Around the Bridge Block Assn. v Giuliani, supra,* 223 AD2d at 74 ["Protocol" no substitute for EIS, City utterly failed to comply at all with SEQRA]). This judicial proceeding has never been the forum in which a decision should or could be made regarding the best public health measures for protecting children from lead-based paint; that legislative function belongs to the New York City Council, where it must remain.

Local Law 38 replaced total abatement of lead-based paint with monitoring and containment. Local Law 38 also: (1) defines "lead-based paint" as paint containing 1.0 milligrams of lead per square centimeter or greater; (2) defines a "lead-based paint hazard" as lead-based paint peeling on any surface or on a deteriorating surface which is in a multiple dwelling in which a child under six resides; (3) prohibits dry sanding or scraping of lead-based paint; (4) provides for referrals for blood screening of lead poisoning; (5) mandates specific notices to tenants about lead paint risks when a lease is signed and annually thereafter; (6) compels owner inquiry regarding the presence of a child under the age of six; (7) mandates annual visual inspec-

tions by an owner; (8) mandates owner correction within certain time frames; (9) imposes various duties on certain municipal agencies; and, (10) creates certain civil and criminal penalties for owner failure to correct violations.

Petitioners' claim that Local Law 38 has increased the public health risks posed by lead-based paint by: (1) changing an owner's obligation from total removal to visual inspection and containment of peeling paint; (2) increasing the amount of lead allowable in paint; (3) decreasing the upper age of a child from six to five; and (4) narrowing the definition of a hazardous condition from all existing lead-based paint to peeling lead-based paint.

Respondents adopted a negative declaration, relieving the City of the obligation to vet the proposed amendments through a process known as an environmental impact statement. Whether respondents' negative declaration complied with SEQRA and CEQR does not depend on the final outcome of their deliberations but on whether relevant areas of environmental concern were identified, a "hard look" was given to those areas and a "reasoned elaboration" made for the final outcome (6 NYCRR 617.7 [a] [2]; *Matter of Committee to Preserve Brighton Beach v Planning Commn. of City of N.Y.*, *supra*, 259 AD2d at 34-35). The potential environmental harm addressed by SEQRA review is that which may be created by the action of the government. Where, as here, governmental action concerns remedies for existing environmental harm, it is important to keep the existing harm separate from the governmental action. The government has not been made responsible for environmental risks created by third parties as a result of SEQRA. A review of the ample record of the Council's consideration of these changes reveals that all relevant environmental issues were identified, explored and resolved as mandated by SEQRA.

## SEQRA OBLIGATIONS

The "basic purpose" of SEQRA is to require consideration of environmental factors when a governmental decision maker is considering an action that may have a significant adverse impact on the environment (6 NYCRR 617.1 [c]). "Action" includes adoption of a local law (6 NYCRR 617.2 [b] [3]) which may not be validly completed unless SEQRA procedures are followed (6 NYCRR 617.3 [a]). SEQRA procedures require identification of the "lead agency," classification of an action as Type I or II or Unlisted and determination of whether or not an EIS will be required (6 NYCRR 617.2 [u], [ai]-[ak]; 617.3

[c]-[f]; 617.6). A Type I action presumptively requires an EIS; a Type II action does not require an EIS; and an Unlisted action may or may not require such evaluation.

In this case, the City Council identified itself as the lead agency and classified adoption of Local Law 38 as an Unlisted action. To determine that an EIS would not be required as a precondition to adoption of Local Law 38, the City Council was required to determine that there would be no adverse environmental impact resulting from governmental action or that any impact would not be significant (6 NYCRR 617.7 [a] [2]). Such determination of significance, in turn, shall have identified the relevant areas of environmental concern, shall have thoroughly analyzed those areas to ascertain whether adoption of the ordinance may have a significant adverse impact on the environment and shall have produced a written reasoned elaboration explaining such determination (6 NYCRR 617.7 [b] [2]-[4]). The criteria for determining significance of especial importance to evaluation of Local Law 38 include: (1) a substantial adverse change in existing air quality; (2) creation of a material conflict with a community's current plans or goals as officially approved; (3) impairment of the quality of important architectural resources; and, (4) creation of a hazard to human health (6 NYCRR 617.7 [c] [1] [i], [iv], [v], [vii]).

## NEGATIVE DECLARATION

The City Council adopted a negative declaration, dispensing with an EIS, based on its finding that adoption of Local Law 38 would not have a significant adverse environmental impact. That negative declaration, in turn, was based on an environmental assessment statement (EAS) (*cf.* 6 NYCRR 617.7 [b] [2] and 617.2 [m]). The EAS identified no significant effects on or arising from (1) neighborhood character, (2) socioeconomic displacement, (3) community facilities, (4) open space, (5) historic and archeological resources, (6) transportation, (7) air quality, (8) infrastructure and energy, (9) natural resources, (10) waterfront revitalization, (11) hazardous materials, (12) noise, and (13) solid waste. The EAS contained extensive narrative addressing a wide variety of potential environmental impacts. Although not addressed under a separate heading, the EAS found no threat to human health created by the adoption of the ordinance since the proposed legislation "would not result in significant generation, storage or disturbance of hazardous materials."

The primary environmental hazards addressed by Local Laws 1 and 38 have arisen from pre-existing lead-based paints.

The only environmental hazards which may be, in some fashion, attributed to action of the municipality actually arose from Local Law 1's now-discredited resort to total abatement, a practice repudiated by the proposed ordinance.

Hearings were held on replacing Local Law 1 or the adoption of Local Law 38 on December 16, 1998 and June 21 and 24, 1999. The City Council had obtained an EAS which included very specific analysis of potential environmental effects of the proposed ordinance as well as input from testimony and written submissions on virtually every aspect of Local Law 38.

The EAS, hearing transcripts and written submissions demonstrate that all relevant issues of environmental concern were identified and that due consideration was given to all of the arguments made by petitioners and others concerned about standards for ascertaining lead paint hazards and methods for addressing them. Petitioners' real complaint is that their views did not prevail.

Specifically, the rationale for moving from a total removal to a containment approach was explicitly addressed by many expert witnesses. Indeed, many of the new features incorporated in the amending ordinance were logical results of the new approach to lead paint. The redefinitions of hazardous paint and the upper age limit of a child were adopted to bring the local law in line with already established federal and state standards (42 USC § 4852 [d] [1]; 15 USC § 2681; 24 CFR 35.1120; 10 NYCRR 67-1.2). The negative declaration's findings that no significant adverse environmental impact would result from adoption of the ordinance was amply supported by expert testimony as well as the existence of and reliance upon state and federal standards. We can reject those findings only by ignoring the extensive and intensive review performed by respondents and by adopting wholesale petitioners' views. The obvious result of such a review would be to grant petitioners the political victory they failed to achieve in the legislative forum. The record evidence consists of testimony or written submissions by physicians, environmental scientists, government officials and property management experts. There was vigorous debate of all relevant environmental issues by the City Council Committee on Housing and Buildings and by the full City Council. Before the Committee and full Council, amendments were proposed and defeated (1) concerning greater dust clearance testing, including lead dust in the definition of "lead based paint hazard," (2) retaining a presumption concerning apartments built before 1960, and (3) using

alternative methods of determining the presence of children under the age of six. Every provision of the amending ordinance had been the subject of extensive debate involving experts from various fields as well as representatives of interested organizations. The record well documents the fair and thorough consideration of the environmental aspects of the new ordinance by the Council. It was not "cursory." Rather, this review clearly satisfied the requirements of SEQRA and CEQR.

Critical to our analysis is the undisputed fact that total abatement, the underlying premise of Local Law 1, had proven itself over two decades to be an unintended health hazard. The City Council was, then, faced with a situation where it was considering an ordinance which would undoubtedly reduce health hazards, albeit not in the exact manner or to the precise extent demanded by petitioners. Nothing in SEQRA, however, requires that governmental remedial actions perfectly solve environmental problems not originally created by the government. SEQRA does not guarantee that petitioners' views will become law, only that they will be considered as the regulations require. That consideration was provided. While petitioners have their own viewpoints as to the only proper methods of identification and treatment of such hazards, their ability to cause the City Council to adopt such methods is a political goal. Having lost the sustained political struggle, petitioners' ability to compel City Council action through judicial nullification depends upon whether the municipal determination is violative of SEQRA (*Roosevelt Islanders for Responsible Southtown Dev. v Roosevelt Is. Operating Corp.*, 291 AD2d 40; *Save the Audubon Coalition v City of New York*, 180 AD2d 348, 355, *lv denied* 81 NY2d 702).

The City Council's SEQRA review revealed that containment of lead paint would reduce, not create, hazards. Adoption of uniform standards consistent with state and federal governments would likewise reduce, not create, hazards. When considering discrete methods of identifying and ameliorating hazards, all of the alternatives would result in a reduction, not a creation, of hazards to human health. While it is certainly true that arguments have been made that more might be done to achieve greater reductions, SEQRA does not impose on governmental entities an obligation to select perfect hazard-reduction methods. SEQRA, by its own terms, would not have required the City Council to adopt either Local Law 1 or Local Law 38 since the hazards were not created by municipal action. The City Council has done nothing to create the hazards posed

by lead-based paint but has sought, first through Local Law 1 and then by the amendments of Local Law 38, methods of reducing those hazards. The SEQRA review which resulted in the negative declaration gave the environmental issues involved a "hard look," since it (1) identified the relevant areas of environmental concern, (2) analyzed those areas to ascertain whether adoption of the ordinance may have a significant adverse impact on the environment and (3) produced a written reasoned elaboration explaining such determination (*Matter of Miller v Kozakiewicz*, 289 AD2d 494; *Roosevelt Islanders for Responsible Southtown Dev. v Roosevelt Is. Operating Corp.*, *supra*; *Real Estate Bd. of N.Y. v City of New York*, 157 AD2d 361, 363-364).

The weight ultimately given the arguments aired during review of the proposed ordinance and the City Council's resolution of any disputes should not have been re-judged by the IAS court (*Matter of Merson v McNally*, 90 NY2d 742, 752; *Matter of Chemical Specialties Mfrs. Assn. v Jorling*, 85 NY2d 382, 396; *Matter of Neville v Koch*, 79 NY2d 416, 424; *Akpan v Koch*, 75 NY2d 561, 570). The City Council adopted a negative declaration which found, based on articulated reasons, that the amendments to how lead paint risks should be identified and ameliorated would not themselves create any significant adverse environmental impacts. As the self-identified lead agency, the Council was only obliged to make a positive declaration with a full EIS if the proposed action may have a significant effect on the environment (*cf.*, 6 NYCRR 617.7 [a]; *see Matter of Committee to Preserve Brighton Beach v Planning Commission of City of N.Y.*, *supra*, 259 AD2d at 34; *Matter of Fisher v Giuliani*, 280 AD2d 13, 17). When an agency has made a negative declaration, it must show that it (1) identified " 'the relevant areas of environmental concern,' " (2) "took a 'hard look' at them," and (3) "made a 'reasoned elaboration of the basis for its determination' " (*Matter of Fisher v Giuliani*, *supra*, 280 AD2d at 20, quoting *Merson*, *supra*, 90 NY2d at 751 [some internal quotations omitted]). This three-part test has its roots in state regulation (6 NYCRR 617.7 [b] [2]-[4]), and related federal laws (*cf.*, *H.O.M.E.S. v New York State Urban Dev. Corp.*, 69 AD2d 222, 232). The *H.O.M.E.S.* Court emphasized that, in determining that "there is no need for an EIS," the agency must have "made a thorough investigation of the problems involved and reasonably exercised its discretion" (*id.* at 231). SEQRA is not a straightjacket which eliminates legislative discretion but a flexible procedure designed to

ensure actual and reasonable consideration of environmental factors before a government acts. "It is not the intention of SEQR that environmental factors be the sole consideration in decision-making" (6 NYCRR 617.1 [d]). Our central task, then, is to determine whether respondents engaged in a "thorough review of each area of relevant concern" (*Matter of Committee to Preserve Brighton Beach v Planning Commn. of City of N.Y.*, *supra*, 259 AD2d at 34). There is no doubt, whatever one's view on the merits of Local Law 38, that the City Council did just that.

The Council clearly took a "hard look" at the potential environmental impact of Local Law 38. A "hard look" need not follow any particular format and the agency is required only to consider reasonable, non-speculative possibilities (*Matter of Fisher v Giuliani*, *supra*, 280 AD2d at 21; *Matter of Neville v Koch*, 79 NY2d 416, 428). When courts review negative declarations accompanying action by local legislatures, the entire record is reviewed to determine the sufficiency of considerations under SEQRA (*Matter of Hoffman v Town Bd.*, 255 AD2d 752, *lv denied* 93 NY2d 803; *Matter of Wilkinson v Planning Bd.*, 255 AD2d 738, *lv denied* 93 NY2d 803; *Matter of Buerger v Town of Grafton*, 235 AD2d 984, *lv denied* 89 NY2d 816; *Matter of Hare v Molyneaux*, 182 AD2d 908).

Areas of environmental concern were identified early in the ordinance drafting process, explicitly and exhaustively addressed through witnesses and written submissions and considered through debate and proposed amendments. While petitioners clearly preferred alternative outcomes for which they lobbied and while the IAS court may have preferred consideration over a longer time frame, the record amply demonstrates that respondents satisfied the procedural requirements of SEQRA and CEQR. The City Council struck that "suitable balance of social, economic and environmental factors" in its consideration and passage of Local Law 38 (6 NYCRR 617.1 [d]). The environmental review laws have, consequently, had their intended beneficial effect.

The order and judgment (one paper), Supreme Court, New York County (Louis York, J.), entered February 22, 2001, which granted the CPLR article 78 petition, declared respondents' negative declaration, passed June 30, 1999, by respondent City Council and signed into law by respondent Mayor on July 15, 1999, null and void, and declared Local Law No. 38 (1999) of the City of New York null and void, should be reversed, on the law, without costs, it is declared that said negative declaration

and Local Law are valid, the petition otherwise denied and the proceeding otherwise dismissed. The appeal from the order of the same court and Justice, entered November 9, 2000, should be dismissed, without costs, as abandoned.

Motions seeking leave to file amici curiae briefs granted.

Tom, J.P., Andrias, Saxe and Lerner, JJ., concur.

Order and judgment, Supreme Court, New York County, entered February 22, 2001, reversed, on the law, without costs, it is declared that respondents' negative declaration and local law are valid, the petition otherwise denied and the proceeding otherwise dismissed. Appeal from order, same court, entered November 9, 2000, dismissed, without costs, as abandoned. Motions seeking leave to file amici curiae briefs granted.