460

■ In the Matter of HELLS KITCHEN NEIGHBORHOOD ASSOCIATION et al., Respondents-Appellants, v CITY OF NEW YORK et al., Appellants-Respondents. [915 NYS2d 565]—

Order and judgment (one paper), Supreme Court, New York County (Paul G. Feinman, J.), entered May 21, 2010, which granted the petition and, inter alia, annulled the determination of the New York City Department of Small Business Services (DSBS) to issue a negative declaration of environmental impact, and annulled the approvals and resolutions issued pursuant thereto by the New York City Planning Commission and the New York City Council, unanimously reversed, on the law, without costs, the petition denied, the determination and the approvals and resolutions issued pursuant thereto reinstated, and the proceeding dismissed. The Clerk is directed to enter judgment accordingly.

This litigation arises out of the City's plan to redevelop Pier 92 and Pier 94, which are located along the Hudson River between West 52nd and West 55th Streets, as a mid-size trade show facility.

It was not necessary to designate the Department of Environmental Conservation (DEC) an "involved agency" as DEC had no approval authority over the action involved in this project (6 NYCRR 617.2 [s]; see Matter of Scenic Hudson v Town of Fishkill Town Bd., 266 AD2d 462, 464 [1999], lv denied 94 NY2d 761 [2000]). As pertains here, DEC's permitting authority under the Tidal Wetlands Act and its implementing regulations only applies to "tidal wetlands and areas adjacent thereto" (ECL 25-0103 [1]; 25-0202 [1]; 6 NYCRR 661.1, 661.3).

6 NYCRR 661.4 (b) (1) defines an area "adjacent" to a tidal wetland in pertinent part as follows:

" 'Adjacent area' shall mean any land immediately adjacent to a tidal wetland within whichever of the following limits is closest to the most landward tidal wetland boundary, as such most landward tidal wetlands boundary is shown on an inventory map . . . :

"(i) 300 feet landward of said most landward boundary of a tidal wetland, provided, however, that within the boundaries of the City of New York this distance shall be 150 feet . . . ; or

"(ii) to the seaward edge of the closest lawfully and presently existing (i.e., as of August 20, 1977), functional and substantial fabricated structure (including, but not limited to, paved streets and highways, railroads, bulkheads and sea walls, and rip-rap walls) which lies generally parallel to said most tidal wetland landward boundary and which is a minimum of 100 feet in length as measured generally parallel to such most landward boundary, but not including individual buildings."

Pursuant to the foregoing statute, the bulkhead which runs along the Hudson River from Battery Place to West 59th Street, serves as the boundary of DEC's tidal wetland jurisdiction since it has existed since at least 1920, runs parallel to the Hudson River, and is several miles long. The Pier 94 headhouse, which will be renovated and reconfigured as part of the project, lies on the landward edge of the bulkhead, and is thus not in an "adjacent area" to a tidal wetland.

Nor is a tidal wetland permit required pursuant to 6 NYCRR 661.5, as the project does not involve expansion or significant alteration of the existing use of the space. Moreover, we find no evidence in the record to support petitioners' claim that the project would involve any in-water construction or would cause any impact on the Hudson River.

We agree with Supreme Court's finding that DSBS identified the relevant areas of environmental concern, took a "hard look" at them, and made a "reasoned elaboration" of the basis for its determination (*see Matter of Riverkeeper, Inc. v Planning Bd. of Town of Southeast*, 9 NY3d 219, 231-232 [2007]; *Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400, 417 [1986]). Further, we find that DSBS's determination was not arbitrary, capricious, an abuse of discretion, or affected by an error of law (*see Akpan v Koch*, 75 NY2d 561, 570 [1990]).

There is no basis, and petitioners provide no legal support, for their argument that a project that falls into multiple Type I categories requires some sort of heightened scrutiny or that there is a greater presumption that an environmental impact statement (EIS) is required. Indeed, while Type I projects are presumed to require an EIS, an EIS is not required when, as

here, following the preparation of a comprehensive environmental assessment statement (EAS), the lead agency establishes that the project is not likely to result in significant environmental impacts or that any adverse environmental impacts will not be significant. In this case, DSBS properly issued a negative declaration that no significant environmental impact will result from the project (*see* 6 NYCRR 617.7 [a]-[c]; *Matter of Spitzer v Farrell*, 100 NY2d 186, 191 [2003]).

As for petitioners' concerns about potential impacts on Clinton Cove Park, the EAS analyzed the park as an open space and found that no significant negative impacts were expected at this site and, in fact, the project would result in "new resources [that] would create an extension of Clinton Cove Park and provide a valuable community amenity." The EAS also found that the project "would increase the total amount of open space in the study area" by over one half an acre and that a 3,390-square-foot public walk would be created that would link Clinton Cove Park with a new 14,600-square-foot public access area along Pier 94. It was not necessary for the EAS to mention Clinton Cove Park in every technical area analysis, or in every section of the EAS. Indeed, "[a]n agency's responsibility under [the State Environmental Quality Review Act] must be viewed in light of a 'rule of reason'; not every conceivable environmental impact, mitigating measure or alternative, need be addressed in order to meet the agency's responsibility" (*Matter of Neville v Koch*, 79 NY2d 416 [1992]; *Matter of C/S 12th Ave. LLC v City of New York*, 32 AD3d 1, 7 [2006]).

In any event, petitioners' concerns about Clinton Cove Park are not supported by any factual or expert evidence, and are based only on their conjecture as to how the project may impact the park. "[G]eneralized community objections" are insufficient to challenge an environmental review that is based on empirical data and analysis, such as the one here (*see Matter of WEOK Broadcasting Corp. v Planning Bd. of Town of Lloyd*, 79 NY2d 373, 385 [1992]).

Finally, the EAS included a comprehensive traffic and transportation analysis and reasonably used the existing environmental setting as a baseline to project future traffic conditions with and without the project in 2011, the year the project would be built, and determined that no "significant impacts from project generated travel demand are expected to occur." Notably, the analysis took into account the traffic circulation improvements that would be implemented at Pier 92 and Pier 94.

Petitioners' arguments related to traffic concerns ignore the

reality that both piers are currently used for trade shows and generate traffic, and thus fail to take account of the existing conditions. Nor is there support in the record for petitioners' claim that Pier 92 is not already used as an exhibition space. To the contrary, the EAS found that Pier 92 is "also used for trade shows in conjunction with Pier 94." Concur—Mazzarelli, J.P., Friedman, Catterson and Manzanet-Daniels, JJ.