[932 NYS2d 1]

In the Matter of CHINESE STAFF AND WORKERS' ASSOCIATION et al., Appellants, v AMANDA M. BURDEN, as Director of the New York City Department of City Planning, et al., Respondents.

First Department, September 8, 2011

## APPEARANCES OF COUNSEL

*John C. Gray, South Brooklyn Legal Services,* Brooklyn (*Rachel Hannaford* and *Jennifer Levy* of counsel), and *Asian American Legal Defense and Education Fund,* New York City (*Bethany Y. Li* of counsel), for appellants.

*Michael A. Cardozo, Corporation Counsel,* New York City (*Elizabeth S. Natrella, Leonard Koerner, Carrie Noteboom* and *Haley Stein* of counsel), for respondents.

## OPINION OF THE COURT

ANDRIAS, J.P.

The issue before us is whether the Department of City Planning (DCP) conducted an adequate environmental review of the proposed rezoning of an approximately 128-block area in Sunset Park, Brooklyn, bounded generally by Third Avenue, 28th Street, 63rd Street and Eighth Avenue. The rezoning was approved by the City Council on September 30, 2009 and was

intended to preserve the existing neighborhood character and scale by placing height limits throughout, create opportunities and incentives for affordable housing through "inclusionary" zoning, and support local retail corridors, while at the same time protecting the residential character of nearby side streets, by applying contextual zoning districts and mapping commercial overlays (commercial districts within residential areas).

DCP, as lead agency, prepared an environmental assessment statement (EAS) and issued a negative declaration, i.e., a determination that the rezoning would have no significant effects on the environment that would require a more detailed environmental impact statement (EIS). Petitioners seek to annul the negative declaration on the ground that DCP's environmental review did not comport with the requirements of the New York State Environmental Quality Review Act (SEQRA) (ECL 8-0101 et seq.; 6 NYCRR 617.1 et seq.) and the City Environmental Quality Review (CEQR) rules (43 RCNY 6-01 et seq.; 62 RCNY 5-01 et seq.). Petitioners maintain that DCP based its development scenario on faulty assumptions that underestimate the opportunities for market-rate development, failed to adequately analyze the impact of the commercial zoning changes in existing residential and commercial districts, which will result in new types of businesses, and failed to adequately analyze CEQR technical areas such as neighborhood character and socioeconomic impacts. Petitioners also contend that DCP's submissions in opposition to the petition should not have been considered because they improperly supplement the EAS.

We find that the EAS, standing on its own, has a rational basis and that DCP's issuance of the negative declaration was a proper exercise of discretion. The EAS identified the relevant areas of environmental concern, made a thorough investigation of those areas, and provided a reasoned elaboration of the basis for its determination. We also find that Supreme Court did not err when it considered DCP's submissions in opposition, which elaborated on the analysis set forth in the EAS.

The study area was predominantly zoned R6 with C1 and C2 overlays on blocks along retail corridors, and a C4-3 district located on a portion of Fifth Avenue. The proposed rezoning mapped R4-1, R4A, R6B, R6A, R7A, and C4-3A contextual zoning districts in the study area, with existing C1-3, C1-4 overlays replaced by C2-4 overlays, and new C2-4 overlays mapped on Fourth Avenue and below 45th Street on Seventh Avenue. All commercial overlays were scaled back from 150-foot depths to

100 feet. The proposed zoning text amendment modified section 23-922 of the NY City Zoning Resolution to allow an Inclusionary Housing Program bonus for development providing affordable housing in the proposed R7A districts within the rezoning area.

Since the proposed action was in the "Type I" category, it "carrie[d] with it the presumption that it [was] likely to have a significant adverse impact on the environment" (6 NYCRR 617.4 [a] [1]). To overcome this presumption, DCP, in a properly completed EAS, was obligated to identify the potential adverse environmental impacts, take a "hard look" at them, and "[make] a reasoned elaboration of the basis for its determination" that there would be no adverse impacts (*see Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400, 417 [1986] [internal quotation marks and citations omitted]; *Matter of Friends of Port Chester Parks v Logan*, 305 AD2d 676 [2003]).

"Judicial review of a lead agency's SEQRA determination is limited to whether the determination was made in accordance with lawful procedure and whether, substantively, the determination 'was affected by an error of law or was arbitrary and capricious or an abuse of discretion' " (*Akpan v Koch*, 75 NY2d 561, 570 [1990]; CPLR 7803 [3]). The reviewing court must employ reasonableness and common sense, tailoring the intensity of the "hard look" to the complexity of the environmental problems actually existing in the project under consideration (*see Matter of Town of Henrietta v Department of Envtl. Conservation of State of N.Y.*, 76 AD2d 215, 224 [1980]). It is not the role of the court to weigh the desirability of the proposed action or to choose among alternatives, resolve disagreements among experts, or to substitute its judgment for that of the agency (*Matter of Merson v McNally*, 90 NY2d 742, 752 [1997]).

█ Measured against this standard of review, we find that DCP's determination that the rezoning will have no significant adverse effect on the environment is the product of an adequate environmental review. The rezoning was developed through a participatory public process, in close consultation with Brooklyn Community Board 7, following a thorough study by city planning officials. In accordance with accepted methodology, as set forth in the 2001 CEQR Technical Manual (the Manual), DCP considered both a "reasonable worst-case scenario" in a future "no-action" condition, as compared to a future "with-action" condition over a 10-year period, and the environmental review categories identified in the Manual (*see Matter of Neville v Koch*,

79 NY2d 416, 427 [1992]; *Matter of C/S 12th Ave. LLC v City of New York*, 32 AD3d 1, 4-5 [2006]; *Matter of Fisher v Giuliani*, 280 AD2d 13, 18 [2001]; 62 RCNY 6-07 [a] [1] ["In making their determination, the lead agencies shall employ the Environmental Assessment Form, apply the criteria contained in § 6-06 and consider the lists of actions contained in § 6-15 of this chapter"]).

Specifically, the EAS identified a "total of 8 projected development sites and 19 potential development sites . . . in the study area" and found, based on the assumptions employed, that 236 housing units and 82,885 square feet of nonresidential space could be expected to be developed under the current zoning on the eight projected development sites, as compared to 311 dwelling units and 65,431 square feet of nonresidential space under the rezoning, a net increase of 75 dwelling units and 18,980 square feet of commercial space. Additionally, approximately 64 of the 75 net incremental units would be affordable, developed pursuant to the Inclusionary Housing Program's floor area ratio (FAR) bonus.*

The EAS then analyzed the potential for adverse impacts in the following areas: land use, zoning and public policy, socioeconomic conditions, community facilities and services, open space, shadows, historic resources, urban design and visual resources, neighborhood character, natural resources, hazardous materials, compliance with the City's waterfront revitalization program, infrastructure, solid waste and sanitation services, energy, traffic and parking, transit and pedestrians, air quality, noise, construction impacts, and public health. Because the EAS found that there would be an incremental increase of only 75 dwelling units, which is below the 200-unit threshold set forth in the Manual (ch 3B, § 200, at 3B-2 [Oct. 2001]), it did not conduct any further assessment of socioeconomic conditions and concluded that the small increase in dwelling units would not result in any potentially significant impacts to the socioeconomic conditions of the area. In making these projections, the EAS employed certain assumptions as to where new development

---

\* "FAR is comprised of total floor area within the building divided by the total area of the lot containing the building. Since residential areas have lower FAR, more lot is required to build larger buildings. . . .

"[O]ne way to control the size of a building is to limit its overall volume through FAR limits" (*Matter of Raritan Dev. Corp. v Silva*, 91 NY2d 98, 105 [1997] [citations and internal quotation marks omitted]).

could reasonably be expected to occur. Recognizing that "generally, for area-wide rezonings that create a range of development opportunities, new development can be expected to occur on selected, rather than on all, sites within a rezoning area," the EAS considered lots of 5,000 square feet or more and excluded sites of schools and churches, buildings with six or more residential units, lots for which there were known developments under construction, and individual landmark buildings or buildings located within a historic district, which were deemed "very unlikely to be redeveloped as a result of the proposed rezoning."

In support of these assumptions, the EAS considered current and past development trends, noting that

> "[a]pproximately 500 units have been constructed or received building permits in the past five years within the rezoning area. Many of these units are within buildings developed under the R6 Quality Housing program and are generally appropriately-scaled and represent continuing investment in this area. However, a few out-of-scale one-hundred foot tall tower developments have been proposed throughout the neighborhood that are inconsistent with the low-rise, rowhouse neighborhood character. Some of these projects have been redesigned in response to community concern, but a few out-of-scale eight and nine-story buildings have been built throughout the neighborhood."

The EAS explained that

> "[t]he projected development sites [were] considered more likely to be developed within the ten-year analysis period (Build Year 2019) because they [were] larger sites built to a low density. Many sites also [had] large surface parking areas. The potential development sites were less likely to be developed within a ten-year period because they [were] not assembled into single ownership, [were] smaller sites, [were] located mid-block and thus [were] more difficult to develop, or [were] located close to entrances and exits to the Brooklyn Queens Expressway and [were] likely to remain in auto-oriented use."

The EAS further explained that "the sites of schools (public and private) and churches that met the development site criteria were built to less than half the permitted FAR under the current zoning designation" and that "it [was] extremely unlikely

that the increment of additional FAR permitted under the proposed zoning would induce redevelopment or expansion of these substantial community structures." As to buildings with six or more residential units, the EAS explained that they "[were] likely to be rent-stabilized and difficult to legally demolish due to tenant relocation requirements."

It cannot be said that these assumptions are not rationally based.

> "[W]hile any single developer will seek to develop its property to capacity should it choose to build, that does not mean, when dealing with the rezoning of a wider geographic area, that the entire area will be developed to full capacity. Development to full capacity will obviously not occur, because market forces act as a constraint. This being so, it was rational for the City to conclude that a full build-out of the Theater Subdistrict was constrained by economic forces" (*Matter of Fisher v Giuliani*, 280 AD2d 13, 22 [2001]).

Relying on the affidavit of their expert, petitioners contend that the exclusion of lots under 5,000 square feet is irrational because most lots in the rezoning area are less than 2,500 square feet, and instances of new development are occurring on lots of less than 5,000 square feet under the existing zoning. Petitioners contend that if the smaller lots were considered, it would add 89 sites and 142,200 square feet of residential space, totaling 142 residential units, which would raise the total number of new units above the 200 threshold needed for socioeconomic analysis. Petitioners also contend that buildings with six or more residential units were irrationally excluded, that there are nine such sites that, if redeveloped, would add 10,623 square feet of residential space, equivalent to 10 residential units, and that the EAS left out 25 sites of greater than 5,000 square feet, which would result in 114 residences.

■ These critiques were rebutted by the affidavits of DCP, which further demonstrated that DCP's assumptions were reasonable. DCP's submissions rationally explain that the EAS excluded lots under 5,000 square feet because buildings on those lots are rarely able to take advantage of the full allowable FAR due to building code requirements that make new construction financially unfeasible. This opinion is based on a review of new building and AI alterations permits issued by the New York City Department of Buildings since 1998, which showed that on lots

of less than 5,000 square feet, 39 of the 46 lots permitted for new construction or major renovation either did not maximize potential development rights or used a mixed-use building density regulation that is no longer available. DCP further explained that the 89 additional sites claimed by petitioners include four double-counted lots, 10 places of worship, and lots located on Fifth Avenue, which was rezoned from R6 to R6A, which does not create an increase in allowable building density.

As to buildings with six or more residential units built after 1974, DCP's submissions reinforced the point that these were excluded because they are generally subject to New York State Division of Housing and Community Renewal rent regulation rules and therefore difficult to demolish legally. As to petitioners' claim that the EAS ignored the impact of the area churches' ability to sell their air rights and property, DCP explained that the amount of unused floor area available to churches decreases under the rezoning, as does a property owner's ability to use development rights derived from church properties.

The dissent believes that DCP's submissions should not have been considered because they improperly supplement the EAS. However, in reviewing the issuance of a negative declaration, a court is obliged to decide whether the agency "made a thorough investigation of the problems involved and reasonably exercised [its] discretion" (*Chinese Staff & Workers Assn. v City of New York*, 68 NY2d 359, 364 [1986]). To be "thorough," an investigation need not entail "every conceivable environmental impact, mitigating measure or alternative" (*Matter of Neville*, 79 NY2d at 425; *see also Matter of Hells Kitchen Neighborhood Assn. v City of New York*, 81 AD3d 460 [2011], *lv denied* 16 NY3d 712 [2011]). It is neither arbitrary and capricious nor a violation of environmental laws for a lead agency "to ignore speculative environmental consequences which might arise" (*see Real Estate Bd. of N.Y. v City of New York*, 157 AD2d 361, 364 [1990] [internal quotation marks and citation omitted]). Since the EAS, standing on its own, complied with SEQRA and CEQR, DCP could rely on the supplemental affidavits to explain the analyses and assumptions set forth in the EAS in response to the specific critiques petitioners raised in this proceeding (*see Matter of Greenberg v City of New York*, 2007 NY Slip Op 33987[U], *14 [Sup Ct, NY County 2007] ["'(W)hile the (EAS) must stand on its own, it would be fundamentally unfair if the lead agency could not address factual assertions made by the petitioners and their experts regarding the proposed action in the context of a legal challenge to an EAS"]).

■ Petitioners also argue that DCP failed to take a hard look at the impact of the commercial zoning changes. The dissent agrees, stating that although the rezoning includes commercial overlays that will permit new businesses, the EAS's discussion of the impact of these changes is conclusory and lacks analysis. However, the EAS explained that the C4-3A zoning district and C2-4 overlay district would conform existing commercial uses and reinforce the commercial nature of the existing corridors. Notably, the blocks rezoned from C4-3 to C4-3A will now have a height limit where none existed before, and the rezoning creates a 10-block section of Fifth Avenue with C4-3A zoning, all of which had previously had a different type of commercial zoning. In addition, the change in zoning from C1-3 to C4-3A will allow for residential uses on the second floors of mixed-use buildings designed for such residential use, since they will now be uses that conform to the zoning. DCP further explained that the C2-4 commercial overlay district extends 100 feet from the avenues, as opposed to the 150-foot overlay that existed under the prior zoning, thereby reducing the extent of the overlay and providing protection to residential side streets from encroaching commercial development. Based on these observations, the EAS rationally concluded that the zoning changes were not likely to result in significant impacts.

Petitioners also argue that DCP ignored CEQR technical areas such as socioeconomic impacts and neighborhood character. The dissent agrees, finding that although the plan permits "upzoning" (an increase in FAR) for 33 blocks on Third, Fourth and Seventh Avenues, which petitioners claim makes the buildings more attractive for development, there is no analysis of the environmental impact of the change on the socioeconomic conditions or neighborhood character.

■ However, once the EAS projected an increase of only 75 units, it was not arbitrary or capricious for DCP to conclude that the rezoning would not have any adverse socioeconomic impacts. In any event, the EAS explains that the purpose of the rezoning was "to preserve neighborhood character while allowing for medium density residential growth which conforms to the existing scale and built form of the neighbourhood [sic]" and that the proposed zoning map and text amendments will:

> "[1] Protect existing row house scale and character on side streets with contextual zoning districts and appropriate location and depth of commercial overlays; [2] Reinforce the avenues as corridors for

mixed retail/residential use; [3] Provide opportunities for housing and development, where appropriate, at a height and scale that is in keeping with the existing context; and [4] Provide incentives for affordable housing with new development."

Further, the EAS rationally concluded that no direct residential displacement is expected as a result of the rezoning because there are no specific development sites with residences or any specific development projects associated with the rezoning, and that the rezoning does not permit a new housing type in the area. Rather, it imposes height limits that are in line with the existing size of buildings in the neighborhood (*see Real Estate Bd.*, 157 AD2d at 365). DCP also noted that the rezoning would create new incentives for affordable housing under the City's Inclusionary Housing Program, through modest increases in allowable residential density along two targeted corridors on Fourth and Seventh Avenues.

Further, as set forth in the EAS, the Manual defines neighborhood character as an amalgam of the various elements that give a neighborhood its distinct personality, including land use, urban design, visual resources, historic resources, socioeconomics, traffic and noise. The EAS analyzes these elements thoroughly. Based on these analyses, in the section related to neighborhood character, the EAS rationally concluded that the rezoning would not result in: (1) development that would conflict with existing uses; (2) substantially different building bulk form, size, scale, street patterns, setbacks, streetscape elements or street hierarchy; (3) changes to natural features or a substantial change to a visual feature; (4) substantial changes to historic resources; (5) significant socioeconomic impact; and (6) substantial changes to traffic. Accordingly, the EAS rationally concluded that the rezoning would not have a significant adverse effect on the environment because it was decreasing, rather than increasing, the potential for development by imposing building height limits that did not previously exist.

While the dissent accepts petitioners' argument that Supreme Court based its decision on a mistaken belief that the Inclusionary Housing Program was mandatory, a review of the order and judgment on appeal demonstrates that the court understood that the program provided a developer with a FAR bonus in exchange for providing affordable housing, and that the program was optional. Further, a reading of the entire decision makes clear that the court was not permitting respondents to avoid

their SEQRA obligations because they included a voluntary affordable housing program in the project.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Michael D. Stallman, J.), entered May 14, 2010, inter alia, denying the petition to annul respondent Department of City Planning's determination that the proposed rezoning of Sunset Park would not have a significant environmental impact, and dismissing the proceeding brought pursuant to CPLR article 78, should be affirmed, without costs.

ABDUS-SALAAM, J. (dissenting). I do not agree with the majority that the New York City Department of City Planning (DCP) complied with the State Environmental Quality Review Act (SEQRA) and the City Environmental Quality Review (CEQR). Accordingly, I respectfully dissent, and would annul the determination.

This proceeding challenges the adequacy of the environmental review undertaken by DCP in connection with the rezoning of more than 25 acres in Sunset Park, Brooklyn, and DCP's determination that the plan, which includes the rezoning of 33 blocks from residential to commercial use, would not have a significant environmental impact. Petitioners are the Chinese Staff and Workers' Association, an organization dedicated to improving the lives of low-income members of the Chinese community with offices in Sunset Park, five churches with congregants in Sunset Park, and two residents of the neighborhood.

The rezoning project was required to undergo environmental review pursuant to SEQRA (ECL 8-0101 *et seq*.; 6 NYCRR 617.1 *et seq*.) and its city counterpart, the CEQR rules (62 RCNY 5-01 *et seq*.). In accordance with SEQRA/CEQR procedures, DCP, acting on behalf of the City Planning Commission (CPC), was designated as the lead agency and was responsible for determining whether an environmental impact statement (EIS) was required (6 NYCRR 617.2 [u]).

DCP determined that this rezoning should be categorized as a "Type I" action because it involved changes in allowable uses affecting 25 or more acres of the zoning district (6 NYCRR 617.4 [b] [2]). Projects classified as Type I are presumed likely to result in adverse environmental impacts and may require the preparation of an EIS (6 NYCRR 617.4 [a]). However,

"while Type I projects are presumed to require an EIS, an EIS is not required when . . . , following

the preparation of a comprehensive environmental assessment statement (EAS), the lead agency establishes that the project is not likely to result in significant environmental impacts or that any adverse environmental impacts will not be significant" (*Matter of Hells Kitchen Neighborhood Assn. v City of New York*, 81 AD3d 460, 461-462 [2011], *lv denied* 16 NY3d 712 [2011]; 6 NYCRR 617.7 [a] [2]).

Here, "[a]lthough the threshold triggering an EIS is relatively low" (*Matter of Spitzer v Farrell*, 100 NY2d 186, 190 [2003]), DCP declined to prepare an EIS based on the negative declaration made in the EAS. In reviewing this determination, this Court is limited to considering whether DCP "identified the relevant areas of environmental concern, took a 'hard look' at them, and made a 'reasoned elaboration' of the basis for [its] determination" (*Chinese Staff & Workers Assn. v City of New York*, 68 NY2d 359, 363-364 [1986] [citations omitted]). While respondents argue that petitioners do not understand the "true nature and effect" of the rezoning, which is intended to have no negative environmental impact and to bring nonconforming uses into conformity, the "nature" of the rezoning and the intentions of the lead agency are not determinative in assessing whether the agency complied with SEQRA.

DCP failed to take the requisite "hard look" at the potential impact of the rezoning on the businesses and residents of Sunset Park and to provide a "reasoned elaboration" of the basis for its negative declaration. For example, the challenged rezoning changed the permissible use from residential to commercial for 33 blocks on Third, Fourth and Seventh Avenues. It permits some upzoning (an increase in the floor area ratio [FAR] of the space permitted to be developed) of the avenues. Petitioners point out that this upzoning means that lots that were once unattractive to developers because they contained buildings using most of the allowable FAR are now attractive because the space that can be developed is larger. The rezoning also includes commercial overlays (commercial districts within residential areas) on the avenues. Seventh Avenue, which is currently zoned residential and does not have any commercial overlay would have a C2-4 overlay. As petitioners observe, while there are many nonconforming uses along Seventh Avenue, most of these uses are small local retail services such as grocery stores and restaurants; the C2-4 commercial overlay will allow for larger businesses and national chains. The EAS noted that this overlay

will permit new businesses, but did not explore or elaborate upon the new businesses that might be established, or analyze the effect of bringing these new businesses to Seventh Avenue.

C2-4 commercial overlays are proposed to replace existing C1-3 and C2-3 overlays on Third, Fourth, Fifth, Sixth and Seventh Avenues. The change from C1 to C2 zoning allows for substantially different kinds of business to locate on the avenue, such as a moving storage facility, auto rental and other services with markets beyond the local neighborhood. In addition, several blocks along Fifth Avenue are currently zoned C4-3; the proposed rezoning would change that designation to C4-3A and expand that district by four blocks. Those four blocks are currently zoned residential with a C1-3 overlay that permits local retail; C4-3A will permit businesses serving regional markets.

The EAS's discussion of the effect of the impact of these commercial zoning changes is conclusory and lacks both analysis of data and any explanation as to the absence of analysis. The EAS merely states:

> "The new overlays mapped on Avenues where none currently exist would bring legal, pre-existing nonconforming commercial uses into conformance and lessen their parking requirements. These changes are unlikely to induce new commercial development and no development sites were identified in these areas.

> "Some overlays were mapped where the uses are predominantly non-commercial today in order to define a specific Avenue as a commercial corridor."

"Conclusory statements, unsupported by empirical or experimental data, scientific authorities or any explanatory information[,] will not suffice as a reasoned elaboration for [DCP's] determination of environmental significance or nonsignificance" (*Matter of Tonery v Planning Bd. of Town of Hamlin*, 256 AD2d 1097, 1098 [1998] [internal quotation marks and citations omitted]). There is no discussion of the current commercial development, the number of nonconforming commercial businesses, any comparison between the portion of rezoning meant to conform existing nonconforming uses with the portion meant to encourage new commercial development, or the impact of defining certain avenues as commercial corridors. Strikingly, there is no analysis of the environmental impact that rezoning 33 blocks from residential use to commercial use might have on socioeconomic conditions or neighborhood character.

Similarly, DCP's consideration of the rezoning's impact upon residential units does not constitute a "hard look." The EAS does not undertake a comprehensive survey of all lots susceptible to development—rather, DCP predicts a development scenario by applying several restrictive criteria to eliminate from consideration, for example, certain lots that, individually or assembled, have an area of under 5,000 square feet. DCP also eliminates from consideration buildings with six or more residential units, reasoning that "[t]hese buildings are likely to be rent-stabilized and difficult to legally demolish due to tenant relocation requirements." Using its restrictive criteria and limited analysis, DCP identified eight lots that were likely to be developed and 19 that had the potential for redevelopment. After calculating that these lots, if developed, would yield an increase of 75 residential units, DCP then applied what it termed the "threshold" of 200 units or less that is identified in the CEQR Technical Manual, and concluded that based on this threshold, there was no need to analyze the potential socioeconomic effect of the plan or its impact on neighborhood character.*

Petitioners submitted to Supreme Court an expert's affidavit explaining that due to DCP's particularly restrictive exclusion of lots less than 5,000 square feet, the EAS had failed to include in its analysis 89 lots that could be developed, although development trends in Sunset Park showed development occurring on lots of typical size, which is less than 2,500 square feet. In assessing this expert opinion, the court was persuaded by the post hoc explanation provided by the Director of the Environmental Assessment and Review Division of DCP that development on those smaller lots is financially unfeasible.

While as Supreme Court correctly noted, it is not the role of the courts to resolve disagreements between experts, the problem with the court's analysis is that the explanation given by DCP's expert as to this and other matters raised by petitioners was not included in the EAS, but instead was supplied in response to this lawsuit. It is the EAS that must include a reasoned elaboration of the basis for the negative declaration

---

* Petitioners point out that although the 2001 CEQR Technical Manual (TM) that applies here notes that, in small to moderate size projects, residential development of 200 units or less would "typically not result in significant socioeconomic impacts" (CEQR TM ch 3-B, § 200, at 3B-2 [Oct. 2001], available at http://www.nyc.gov/html/oec/html/ceqr/2001ceqrtm.shtml), this is not described as a threshold. In contrast, the revised 2010 manual refers to this and other factors as thresholds (CEQR TM ch 5, § 200, at 5-3 [May 2010]).

(*see Matter of Bauer v County of Tompkins*, 57 AD3d 1151, 1153 [2008]).

> "*Before* issuing a declaration of nonsignificance, the lead agency must take a hard look at the relevant areas of environmental concern. If such is not done, 'there is a danger that the subsequent finding, made after the [environmental assessment form] is reviewed, would merely be a "rubber stamp" or afterthought' (*Matter of E.F.S. Ventures Corp. v Foster*, 71 NY2d 359, 371)" (*Matter of Tonery*, 256 AD2d at 1098 [emphasis added]).

"SEQRA's fundamental policy is to inject environmental considerations directly into governmental decision making . . . [and] is not mere exhortation" (*Matter of Coca-Cola Bottling Co. of N.Y. v Board of Estimate of City of N.Y.*, 72 NY2d 674, 679 [1988]).

I disagree with the majority's conclusion that the EAS, standing on its own without benefit of the supplemental submissions, complies with SEQRA and that the supplemental affidavits submitted by DCP merely serve to rebut specific charges by petitioners in this proceeding. Although (as Supreme Court noted) the EAS consists of 49 pages that discuss the various required considerations, such as land use, neighborhood character, and socioeconomic impact (or explain why a discussion is not necessary), the EAS essentially merely lists the criteria; it does not set forth a reasoned elaboration of DCP's determinations and fundamental assumptions. Thus, the supplemental materials provided in response to this lawsuit do not elaborate on the EAS; they are the first attempts at providing a reasoned elaboration. This does not meet the mandates of SEQRA, which, according to well-established precedent, requires the agency to analyze a proposed action, and then set forth its analysis, in the EAS.

Finally, Supreme Court recognized that petitioners had asserted that the rezoning will serve as an incentive to redevelopment and will change the residential area of three- to four-story buildings into six-story buildings, as well as to displace low-income and minority residents of Sunset Park. In addressing this assertion and the explanation in the EAS that the Inclusionary Housing Program will come into play, the court concluded that "[m]aking the creation of affordable housing (through the Inclusory [*sic*] Housing Program) a condition of new development militates in favor of a finding that the

presumption [that an EIS was required] has been overcome" (27 Misc 3d 1219[A], 2010 NY Slip Op 50804[U], *8 [2010]). However, this conclusion was based on the erroneous premise that affordable housing is required in the rezoning plan. The Inclusionary Housing Program is voluntary, not mandatory. Respondents do not maintain otherwise. In fact, the EAS speaks of an Inclusionary Housing bonus that creates incentives for, but does not require, the development and preservation of affordable housing. While the majority concludes that the court understood that the program was optional, the court's characterization of the Inclusionary Housing Program as "a condition" of new development suggests otherwise.

CATTERSON and FREEDMAN, JJ., concur with ANDRIAS, J.P.; MOSKOWITZ and ABDUS-SALAAM, JJ., dissent in an opinion by ABDUS-SALAAM, J.

Order and judgment (one paper), Supreme Court, New York County, entered May 14, 2010, affirmed, without costs.